1999-NMSC-001

971 P.2d 829

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Valente ROJO, Defendant–Appellant.**

No. 24,319.

Supreme Court of New Mexico.

Dec. 3, 1998.

Rehearing Denied Jan. 6, 1999.

Marc H. Robert, P.C., Marc H. Robert, Albuquerque, for Appellant.

Hon. Tom Udall, Attorney General, Arthur W. Pepin, Assistant Attorney General, Santa Fe, for Appellee.

## OPINION

MINZNER, J.

{1} Defendant appeals his convictions for first degree murder, tampering with evidence, and kidnapping. On appeal, Defendant asserts that (1) there was insufficient evidence to support any of his convictions; (2) the district court violated his constitutional right to be free from double jeopardy by convicting and sentencing him for both murder and kidnapping; (3) the district court erred in denying his motion to disclose the identity of a confidential informant or conduct an in camera review under Rule 11–510 NMRA 1998; (4) the district court erred in admitting hearsay testimony and evidence of his alleged prior violent acts toward the victim; (5) he was denied his constitutional right to a speedy trial; (6) he was denied a fair trial due to prosecutorial misconduct; (7) the State violated the discovery requirements of Rule 5–501 NMRA 1998; (8) he received ineffective assistance of counsel; and (9) he was deprived of a fair trial due to the cumulative errors committed at trial. We reverse Defendant's conviction for kidnapping because it is not supported by substantial evidence, and therefore we need not reach Defendant's claim of double jeopardy. Finding no merit in Defendant's claims regarding the remaining issues, we affirm his convictions for first degree murder and tampering with evidence.

### I. Background

{2} Between 10:30 and 11:30 p.m. on the evening of December 20, 1994, a junk collector discovered the body of a seventeen-year-old female in a dumpster in Albuquerque. The victim's body was found nude, duct-taped into a fetal position and wrapped in plastic garbage bags. There was another plastic bag over the victim's head, and a jump rope was tied around her neck. The victim's clothing also was found in the dumpster, but there was no evidence that her clothes were torn from her body. The individual who discovered the body immediately alerted the authorities.

{3} When police and medical personnel arrived, the victim's skin was still warm, but the rigor mortis process had already begun. The victim's body was taken to the Office of the Medical Investigator between 9:00 and 10:00 a.m. the next morning. The State's chief medical investigator, Dr. Zumwalt, conducted the autopsy. He could not pinpoint the time of death with certainty. Based upon the ambient temperature on the night the body was found, his own observations, and observations of police and medical personnel who first arrived at the scene, Dr. Zumwalt concluded that the victim probably died "within hours" of being found in the dumpster on the evening of December 20, 1994.

{4} At trial, Dr. Zumwalt opined that the killing was a homicide, and that the cause of death was ligature strangulation. According to Dr. Zumwalt, the strangulation could have caused the victim to become unconscious in less than ten seconds, but the killer would have needed to strangle her for several minutes in order to kill her. Since there were no signs of defensive injuries, Dr. Zumwalt introduced the possibility that the victim had been incapacitated before she was strangled to death. However, he could not point to any conclusive evidence showing whether or by what means she had been incapacitated. There was no evidence of drugs or alcohol in her body.

{5} Dr. Zumwalt did find evidence that the victim engaged in sexual activity within the twenty-four-hour period before her death. The victim's fiance, Jaime Antillon, testified that he had sexual intercourse with the victim the night before her body was discovered, and this testimony was consistent with the State's DNA analysis. The State's analysis excluded the DNA of Defendant and his friend, Hector Camacho, from the DNA found on the victim's body. Also, the State could not identify the source of several hairs found on the victim's body; they did not match the hair samples taken from Defendant, Camacho, and Antillon. Thus, there was no physical evidence directly linking Defendant to the victim's body.

{6} There was, however, evidence that Defendant had a relationship with the victim. According to several witnesses, the victim had been dating Defendant, Antillon, or both men in the months prior to her death. Marleen Herrera, who described Defendant as "like a brother" to her, testified that Defendant told the victim he wanted to die if the victim's family did not want her to marry him. A friend of both Defendant and the victim, Mirabel Munoz, testified that one day Defendant said he would kill the victim after he saw her with Antillon. Munoz also testified that the victim once had a swollen mouth and black marks on her arm; the victim told Munoz that Defendant had hit her.

{7} On the morning of December 20, Defendant called the victim and spoke with her on the telephone at her home. Before noon on that date, two witnesses observed the victim meet with Defendant and get into his car at the South Broadway Cultural Center. These witnesses lived across the street from the Cultural Center. One of them recognized the victim because she worked at the same school the victim attended. The victim appeared happy at the time she got into Defendant's car and left the Center. The witnesses observed that the victim's car remained at the Cultural Center the rest of the day. On the next morning, December 21, the victim's car was found still parked in the same place where the two witnesses had observed her leaving it the day before.

{8} Defendant's friend, Hector Camacho, testified that he also met with Defendant on December 20, and that Defendant had a few hundred dollars at that time. When he asked Defendant how he came across the unusual amount of cash he had that day, Defendant responded by saying that he did a "job for someone"; he killed some guy, choked him, threw him in the trash, and took the money. Camacho stated that Defendant described the victim's face as bubbling with rolling eyes. This statement was consistent with Dr. Zumwalt's testimony regarding the strangulation process the victim experienced.

{9} Camacho's testimony regarding the cash in Defendant's possession also was consistent with the accounts given by Antillon and the victim's sister, who each testified that Antillon had given the victim $400 in cash to hold on the night of December 19. Antillon and the victim had planned to use the money to go Christmas shopping together the next evening. There was testimony that the victim also had an uncashed paycheck with her prior to her murder. After her death, police discovered that the check had been cashed by an unidentified person.

{10} The victim's family was notified of her death at about 4:30 p.m. on December 21. The next morning, Munoz called Defendant to tell him about the victim's death and the discovery of her body. On the evening of December 22, Defendant boarded a plane to Mexico to stay with his extended family. Defendant's brother testified that, at the time Defendant left for Mexico, Defendant was afraid he might get into trouble about the victim's death.

{11} In January 1995, Defendant left Mexico and went to Chicago, Illinois. Chicago Police Officer William Ruck arrested Defendant in Chicago in November 1995. Ruck testified that when he asked Defendant if he knew why the officers were at his apartment, Defendant replied that it was about something that happened in New Mexico. Ruck then read Defendant his rights and repeated his question about why the officers were at Defendant's apartment. According to Ruck, Defendant replied that it was because he "killed someone." When Ruck asked Defendant to give a written confession, however, Defendant refused. Ruck did not note Defendant's oral confession in his police report; the report only noted that Defendant knew he had a murder warrant out for his arrest.

{12} Authorities returned Defendant to New Mexico to stand trial, where he testified in his own defense. In his trial testimony, Defendant admitted that he had a sexual relationship with the victim. According to Defendant, he wanted to marry the victim at the beginning of their relationship, but things were "going downhill" after June 1994. The State introduced letters that Defendant had written to the victim during this period, in which Defendant asked for her forgiveness for being violent with her, and wrote that he could not be without her. Defendant admitted that he had hit the victim once, and that

it made him upset that their relationship was over. However, he denied that he had threatened to kill the victim.

{13} Defendant confirmed that he met the victim in the parking lot of the South Broadway Cultural Center on the morning of December 20, 1994. He testified that he called the victim that morning and arranged to meet her there. At the Cultural Center, the victim returned some of Defendant's shirts, and then, according to Defendant, they drove to Tingley Beach to discuss their relationship. Defendant testified that they decided to break up, and then he took the victim back to the Cultural Center. He further testified that he dropped the victim off beside the parking lot at the Cultural Center, and that was the last time he saw her.

{14} Defendant stated that, after his meeting with the victim, he went to a restaurant to talk to his friend, Veronica Espinosa, who was working there that day. According to Defendant, he was with Espinosa at the restaurant from 11:00 a.m. until 1:30 or 2:00 p.m. that day, and then he went to his mother's house to drop off the shirts the victim had returned to him. After stopping at his mother's house to drop off the shirts, Defendant claimed he picked up his friend Camacho around 2:30 to 3:00 p.m.

{15} Defendant admitted to "joking" with Camacho that he killed someone and threw him in the trash, but he denied saying anything to Camacho about strangulation. Defendant testified that after he and Camacho played pool, they returned to Camacho's house, and then they went to Munoz's apartment around 4:00 p.m. He told Munoz that he and the victim had a fight, and the victim had decided to go to Mexico. After talking with Munoz, Defendant claimed he went shopping, got a haircut, and then went home for dinner. He testified that he went out again to play pool and cards later that evening.

{16} Defendant claimed that he left Albuquerque after the murder because he was afraid that Alonzo Ibarra would have him killed. At the time of the murder, Ibarra was the owner of a restaurant and a nightclub that Defendant and the victim frequented. Ibarra was under investigation for drug trafficking at that time, and a confidential informant later reported an unsubstantiated rumor that Ibarra had participated with Defendant in the victim's murder. Defendant believed that Ibarra had one of his uncles killed, and that Ibarra was close to the victim's family. Defendant also claimed that he left Mexico and went to Chicago because Ibarra's family lives in a town in Mexico that is close to the town where Defendant was staying, and he had heard that Ibarra's family was looking for him there.

{17} Concerning his arrest in Chicago, Defendant admitted telling Ruck that he believed the police were at his apartment because of a "warrant out here in New Mexico," but denied confessing to Ruck that he had killed someone. Defendant's friend, Espinosa, was with him when police arrested him in Chicago. Espinosa and some of Defendant's family members also testified in his defense at trial.

{18} After hearing the evidence, the jury convicted Defendant of first degree murder, tampering with evidence, and kidnapping. Pursuant to these guilty verdicts, the district court sentenced Defendant to life imprisonment for first degree murder, eighteen months for tampering with evidence, and eighteen years for kidnapping. This appeal followed.

## II. *Sufficiency of the Evidence*

{19} Defendant claims that his convictions must be reversed because they are not supported by substantial evidence. Substantial evidence is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *See State v. Baca*, 1997–NMSC–059, ¶ 14, 124 N.M. 333, 950 P.2d 776. In reviewing the sufficiency of evidence used to support a conviction, we resolve all disputed facts in favor of the State, indulge all reasonable inferences in support of the verdict, and disregard all evidence and inferences to the contrary. *Id.* Contrary evidence supporting acquittal does not provide a basis for reversal because the jury is free to reject Defendant's version of the facts. *See State v. Salazar*, 1997–NMSC–044, ¶¶ 44, 46, 123 N.M. 778, 945 P.2d 996. However, determining the sufficiency

of evidence " 'does require appellate court scrutiny of the evidence and supervision of the jury's fact-finding function to ensure that, indeed, a rational jury *could* have found beyond a reasonable doubt the essential facts required for a conviction.' " *Baca,* 1997–NMSC–059, ¶ 13, 124 N.M. 333, 950 P.2d 776 (quoting *State v. Garcia,* 114 N.M. 269, 274, 837 P.2d 862, 867 (1992)). We apply these principles to our review of the evidence used to support Defendant's convictions for murder, tampering with evidence, and kidnapping.

### A. *Murder*

{20} Defendant was convicted of first degree murder under NMSA 1978, § 30–2–1(A)(1) (1994), for the willful, deliberate and premeditated killing of the victim without lawful justification or excuse. The jury was instructed on the elements of willful and deliberate murder in accordance with UJI 14–201 NMRA 1998. These elements are:

1. The defendant killed [the victim];

2. The killing was with the deliberate intention to take away the life of [the victim];

3. This happened in New Mexico on or about the 20th day of December, 1994.

We conclude that there is sufficient evidence for a rational trier of fact to have found each of the essential elements of this crime beyond a reasonable doubt.

{21} At trial, several witnesses testified that they saw the victim alive on the morning of December 20, 1994. The State presented evidence that the victim's body was discovered in a dumpster in Albuquerque between 10:30 and 11:30 p.m. that evening, and that the victim probably was killed within hours of the discovery of her body. This evidence is adequate to support the conclusion that the killing happened on or about the 20th day of December 1994.

{22} The State presented several witnesses whose testimony connected Defendant with the crime by establishing that: (1) Defendant was the last person seen with the victim on the date of the killing; (2) the victim was given several hundred dollars in cash the night before she met with Defendant for the last time; (3) Defendant was seen with several hundred dollars in cash after his last meeting with the victim; (4) Defendant told a friend he obtained the cash after killing someone and throwing the body in the trash; (5) Defendant told the arresting officer that he had killed someone in New Mexico; (6) Defendant's recent break-up with the victim provided him with a motive for killing her; (7) prior to the killing, Defendant had threatened to kill the victim after seeing her with another man; (8) on the date of the killing, Defendant told a friend that the victim had gone to Mexico; and (9) Defendant fled New Mexico shortly after he was informed that the victim's body had been discovered.

{23} When viewed as a whole in the light most favorable to the State, this evidence is adequate to support the conclusion that Defendant killed the victim. "Just because the evidence supporting the conviction was circumstantial does not mean it was not substantial evidence." *State v. Duran,* 107 N.M. 603, 605, 762 P.2d 890, 892 (1988). Further, just because each component may be insufficient to support the conviction when viewed alone does not mean the evidence cannot combine to form substantial, or even overwhelming, support for the conviction when viewed as a whole. *See State v. Motes,* 118 N.M. 727, 730, 885 P.2d 648, 651 (1994).

{24} The State's medical investigator testified that the victim was killed by ligature strangulation, taped into a fetal position, covered with plastic bags, and placed in a dumpster without identification. According to the medical investigator, it takes at least several minutes to kill a person in this manner. When combined with the evidence concerning Defendant's motive for the killing, this evidence concerning the method used to kill the victim provides adequate support for the conclusion that the killing was with the deliberate intention to take away the life of the victim. *See Motes,* 118 N.M. at 729–30, 885 P.2d at 650–51 (reasoning that evidence concerning method and motive supported the conclusion that the defendant acted with deliberate intent); *cf. State v. Smith,* 76 N.M. 477, 482, 416 P.2d 146, 149–50 (1966) (noting

that jury may consider the relationship of the parties and the animus of the accused toward the deceased). Thus, there is sufficient evidence to support each element required to sustain Defendant's conviction for first degree murder under Section 30–2–1(A)(1), and we need not consider felony murder as an alternative basis for affirming Defendant's murder conviction.

## B. *Tampering with Evidence*

■ {25} Defendant was convicted of tampering with evidence under NMSA 1978, § 30–22–5 (1963). The jury was instructed on the elements of this crime in accordance with UJI 14–2241 NMRA 1998. These elements are:

1. The defendant hid or placed the body of [the victim] in a dumpster;

2. The defendant intended to prevent the apprehension, prosecution or conviction of himself;

3. This happened in New Mexico on or about the 20th day of December, 1994.

We conclude that there is sufficient evidence for a rational trier of fact to have found each of the essential elements of this crime beyond a reasonable doubt.

{26} According to one of the State's witnesses, on the date the victim's body was discovered, Defendant stated that he had killed someone and thrown the body in the trash. Combined with the other evidence linking Defendant to the murder, it was reasonable for the jury to infer from this statement that Defendant not only killed the victim, but also placed her body in the dumpster. *Cf. Duran,* 107 N.M. at 605, 762 P.2d at 892 (circumstantial evidence may provide adequate support for first degree murder conviction); *Motes,* 118 N.M. at 729, 885 P.2d at 650 (same). Further, based

upon the evidence that the victim's nude body was found without identification, covered with plastic bags and duct tape, inside a dumpster, it was reasonable for the jury to infer that Defendant intended to prevent his own apprehension, prosecution, or conviction as the victim's murderer. *See State v. Roybal,* 115 N.M. 27, 33–34, 846 P.2d 333, 339–40 (Ct.App.1992). Thus, there is sufficient evidence to support each element required to sustain Defendant's conviction for tampering with evidence under Section 30–22–5.

## C. *Kidnapping*

■ {27} Defendant was convicted of aggravated kidnapping, a first degree felony under NMSA 1978, § 30–4–1(A) and (B) (1973, prior to 1995 amendment), for the unlawful taking, restraining, or confining of the victim by force or deception with the intent that she be held for ransom, confined as a hostage, or held to service against her will, suffering great bodily harm. The jury was instructed on the elements of this crime in accordance with UJI 14–404 NMRA 1996 (withdrawn 1997).[1] These elements are:

1. The defendant took or restrained or confined [the victim] by force or deception;

2. The defendant intended to hold [the victim] for service against her will;

3. The defendant inflicted great bodily harm on [the victim];

4. This happened in New Mexico on or about the 20th day of December, 1994.

During closing arguments at trial, the State asserted that Defendant used force or deception to remove the victim's clothing, and that the "held to service" requirement was met because "[n]obody gets wrapped in duct tape like that for fun."

---

1. Under the 1995 amendment to Section 30–4–1, kidnapping was redefined to include "the unlawful taking, restraining, transporting or confining of a person, by force, intimidation or deception, with intent ... to inflict death, physical injury or a sexual offense on the victim." 1995 N.M.Laws ch. 84, § 1. Following this amendment, UJI 14–404 was withdrawn and a new set of Uniform Jury Instructions for kidnapping was substituted in its place. *See* UJI 14–403, 14–6018 NMRA 1998. Since Defendant was charged and con-

victed under the statute and jury instructions in effect prior to these amendments, we do not consider whether the evidence would support a conviction under the new definition of kidnapping. Also, since we reverse Defendant's kidnapping conviction due to the insufficiency of the evidence, we need not decide whether the district court erred in supplementing the jury instruction for kidnapping in response to a question from the jury.

{28} On appeal, the State presents several alternative theories to support Defendant's kidnapping conviction. In particular, the State asserts that when Defendant met with the victim on the morning of December 20, he got her to go along with him through deception or used force to incapacitate her in some way. Also, to satisfy the "held to service" requirement, the State asserts that Defendant took the victim by force or deception to rob her, rape her, or convince her to break up with Antillon.

{29} Applying the kidnapping statute in effect prior to the 1995 amendment, we determine that the evidence is not sufficient to support Defendant's conviction for kidnapping under any of the State's theories. Under this version of the statute, "the incidental movement of a victim to a remote location for the purposes of facilitating a murder does not by itself constitute kidnapping." *State v. Baca*, 120 N.M. 383, 393, 902 P.2d 65, 75 (1995) (citing *State v. Vernon*, 116 N.M. 737, 741, 867 P.2d 407, 411 (1993)). *See generally* Timothy J. Snider, Annotation, *Validity, Construction, and Application of "Hold to Service" Provision of Kidnapping Statute*, 28 A.L.R.5th 754, 760–61 (1995). "The legislature ... did not intend that this scenario be construed as kidnapping, as evidenced by the specific enumeration of elements in our kidnapping statute" prior to the 1995 amendment. *Vernon*, 116 N.M. at 741, 867 P.2d at 411. In particular, the benefit conferred on a defendant by killing a victim, or moving the victim to a location where there are fewer witnesses, is not the kind of "service" contemplated by the kidnapping statute. *See id.*

{30} The State contends that a reasonable juror could still conclude that Defendant benefitted from kidnapping the victim by obtaining money, sexual gratification, or the opportunity to convince her to rekindle their relationship. *See State v. Kersey*, 120 N.M. 517, 520–21, 903 P.2d 828, 831–32 (1995). The present case is distinguishable from *Kersey*, however, because there is not substantial evidence that Defendant intended to hold the victim for service, or that he used force or deception to effectuate such an intention prior to the killing. In *Kersey*, 120 N.M. at 519, 903 P.2d at 830, there was evidence that the

kidnapper "purchased a pair of handcuffs and a security guard badge" prior to the kidnapping. The kidnapper then took the victim from school and handcuffed him under the pretense of being a police detective. *Id.* The victim was later taken to a remote location where he was stabbed with an ice pick and strangled with an electrical cord. *Id.* Thus, the jury could reasonably infer from the purchase of the badge and handcuffs that, prior to taking the victim from the school in handcuffs, the kidnapper formed the intent to hold the victim by force or deception. Also, there was conclusive evidence that the force used to take the victim from school was not the same as the force used to kill him.

{31} In the present case, however, there is no evidence of when Defendant acquired the means of incapacitating or deceiving the victim, nor is there evidence of how such incapacitation or deception was accomplished. Thus, one can only speculate that, prior to the killing, Defendant formed the intent to hold the victim for service against her will or used force or deception for this purpose. "A conclusion based on mere conjecture or surmise will not support a conviction." *State v. Bankert*, 117 N.M. 614, 618, 875 P.2d 370, 374 (1994); *see also State v. Benton*, 118 N.M. 614, 615–16, 884 P.2d 505, 506–07 (Ct.App.1994) ("The rule requiring that we indulge in all reasonable inferences supporting the conviction still does not permit us to speculate....") (citations omitted); UJI 14–6006 NMRA 1998 (instructing jurors that "[y]our verdict should not be based on speculation, guess or conjecture").

{32} The fact that there were no defensive wounds on the victim's body, without more, is not adequate to support the conclusion that she was incapacitated and held to service prior to her death. The State's medical investigator admitted that the bruise underneath the victim's scalp probably was too small to support the inference that someone knocked her unconscious, and that he could not tell from the physical evidence whether a separate strangulation, that only rendered the victim unconscious, preceded the victim's death. The medical investigator only discussed the possibility that the victim was

bound in duct tape after the killing, not before.

{33} The evidence that the victim engaged in sexual activity within twenty-four hours of her death also is not adequate to support the State's kidnapping theories. Unless the victim was incapacitated at the time of the attack, the lack of evidence of defensive wounds or forced removal of the victim's clothing is consistent with consensual sex, and the State admitted during its closing argument that the killing might have begun as a consensual sexual encounter. Further, the State's DNA analysis could not establish that Defendant had sex with the victim on the day of her death. Given the lack of physical evidence presented at trial, a reasonable jury could not have found that Defendant held the victim to service for sexual purposes without relying on speculation.

{34} Finally, Defendant's kidnapping conviction does not find adequate support in the fact that the money the victim had received was missing from her body when it was discovered in the dumpster. When robbery is used to satisfy the "held to service" requirement for kidnapping, the State must show that robbery was the goal of the kidnapping. *See Vernon*, 116 N.M. at 740, 867 P.2d at 410; *State v. Ortega*, 112 N.M. 554, 570–71, 817 P.2d 1196, 1212–13 (1991). In this case, the testimony of Defendant's friend, Camacho, was used to support the inference that Defendant had taken the money from the victim. According to Camacho, however, the purpose of the "job" Defendant told him about was murder, not robbery. Thus, Camacho's testimony supports Defendant's conviction for murder, not kidnapping.

{35} As in *Benton*, 118 N.M. at 616, 884 P.2d at 507, "we cannot articulate the analysis by which a rational jury could have found the[ ] elements [of kidnapping] on the basis of the bare-bones evidence presented below." Therefore, we must reverse Defendant's conviction and sentence for kidnapping. Our reversal of Defendant's conviction and sentence for kidnapping makes it unnecessary for us to reach the question of whether Defendant's constitutional right to be free from double jeopardy was violated, or whether any of the other issues raised by Defendant affect his kidnapping conviction.

### III. *Disclosure of Confidential Informant*

{36} Defendant's next contention is that the district court erred in refusing to disclose the identity of a confidential informant (CI) or to conduct an in camera hearing to determine whether Defendant is entitled to use the CI's testimony at trial. Under Rule 11–510(A), the State has the privilege of refusing to disclose the identity of a CI. However, if a defendant can show that the CI can provide testimony that is relevant and helpful to the defense, or is necessary to a fair determination of the defendant's guilt or innocence, the district court must give the State an opportunity to show in camera facts relevant to determine whether the CI can, in fact, supply such testimony. Rule 11–510(C)(2). If the district court determines that there is a reasonable probability that the CI could supply the testimony, and the State exercises its privilege to withhold, the trial court can dismiss the charges related to the CI's testimony. *Id.*

{37} In this case, Defendant filed a pretrial motion alleging that there was a reliable and credible CI who provided an FBI agent with specific information that Alonzo Ibarra killed the victim. Defendant asserted in his motion that this information is relevant and helpful to the defense, and necessary to a fair determination of his guilt or innocence, because it is the only "directly exculpatory evidence" to show that someone else killed the victim. The district court held a hearing on the motion at which FBI Agent Gonzales and APD Detective Fay testified concerning the information received from the CI. Gonzales testified that he received two items of information from the CI: the first was a rumor that Ibarra had participated with Defendant in the victim's murder; the second was a statement, four times removed from Defendant, to the effect that Defendant told his brother that he would implicate Ibarra in the killing because "he was not going down by himself." Fay confirmed that the FBI shared these items of information with him. Noting that the CI was not an active participant or eyewitness to the murder, and

that the information she received was hearsay, the district court denied Defendant's motion prior to trial.

{38} However, the court permitted Gonzales and Fay to testify at trial about the information the CI gave them. Gonzales testified that he was notified of a rumor on the street to the effect that Ibarra and Defendant did cocaine with the victim, had sex with her, and then they killed her. The CI also conveyed to Gonzales that these events took place in the afternoon, at Ibarra's night club, which was less than a mile from the dumpster in which the victim's body was discovered. Gonzales also testified that the CI would be in danger if her identity were revealed.

{39} We review the district court's denial of Defendant's motion under Rule 11–510(C)(2) for an abuse of discretion. *See State v. Chandler,* 119 N.M. 727, 733, 895 P.2d 249, 255 (Ct.App.1995). Here we find no abuse of discretion. According to the testimony of Gonzales and Fay, the information from the CI tended to implicate both Ibarra and Defendant in the victim's murder. Thus, it was not "directly exculpatory evidence" as alleged by Defendant in his motion.

{40} Further, the statements that the CI attributed to Defendant or his brother were conveyed through several layers of hearsay, there was no testimony that the CI was an active participant or eyewitness to the killing or the events surrounding it, and the physical evidence gathered by the medical investigator did not corroborate the CI's story that the victim had used cocaine prior to the killing. *See State v. Ortega,* 112 N.M. 554, 574, 817 P.2d 1196, 1216 (1991) (finding no abuse of discretion in denying disclosure, following an in camera hearing, where the information "was second- or third-hand hearsay, and nondisclosure was ordered in part out of concern for the safety of the informants"); *State v. Lovato,* 117 N.M. 68, 70, 868 P.2d 1293, 1295 (Ct.App.1993) (finding no abuse of discretion in denying in camera hearing where the defendant failed to show that the CI was an active participant in the crime in question). Under these circumstances, the district court did not err in determining that Defendant failed to show

the CI's testimony was relevant or helpful to the defense, or necessary to the fair determination of Defendant's guilt or innocence. Because Defendant failed to make this preliminary showing, neither disclosure of the CI's identity nor an in camera hearing were required under Rule 11–510(C)(2). *See Lovato,* 117 N.M. at 70, 868 P.2d at 1295.

## IV. *Admissibility of Hearsay Evidence and Prior Acts of Defendant*

{41} We review the trial court's evidentiary rulings for abuse of discretion. *See State v. Woodward,* 121 N.M. 1, 4, 908 P.2d 231, 234 (1995). " 'An abuse of discretion occurs when the ruling is clearly against the logic and effect of the facts and circumstances of the case. We cannot say the trial court abused its discretion by its ruling unless we can characterize it as clearly untenable or not justified by reason.' " *Id.* (quoting *State v. Apodaca,* 118 N.M. 762, 770, 887 P.2d 756, 764 (1994)).

### A. *Hearsay Evidence*

{42} The State filed pretrial motions under the residual exceptions to the hearsay rule, Rules 11–803(X), 11–804(B)(5) NMRA 1998, seeking admission of certain statements the victim made to her mother, sister, friend, and fiance. Defendant also filed a pretrial motion seeking admission of statements made by the victim to Defendant and his family. At a hearing on these motions, Defendant's trial counsel stated that "whatever ruling you rule for one of us you're going to rule for both of us" on this issue. The district court ruled in favor of admitting the hearsay evidence regarding the statements made by the victim that were identified in the pretrial motions.

{43} At trial, the district court interrupted the testimony by the State's witnesses on more than one occasion to inquire why Defendant's trial counsel was not objecting to the admission of hearsay concerning the victim's statements, and Defendant's trial counsel explained that he was not objecting "for tactical reasons." The only objection to such hearsay that appears in the portion of the trial transcripts identified in Defendant's

brief concerns the testimony of Antillon, the victim's fiance. The State responded to this objection at trial by noting that the statements in question were covered by the district court's ruling on the pretrial motions, and the objection was overruled.

{44} On appeal, Defendant contends that the district court erred in admitting the testimony by the decedent's mother, sister, fiance, and friend concerning the statements made by the victim. Defendant further contends that the hearsay evidence provided by these witnesses went beyond the statements identified by the State in its pretrial motions. We conclude, however, that the issue of applying the residual exceptions in Rules 803(X) and 804(B)(5) to the statements made by the victim was not preserved for appellate review because Defendant agreed to admit the statements identified in the State's pretrial motions on condition that the statements Defendant sought to introduce also were admitted, and because Defendant did not object in a timely manner to any statements that exceeded the scope of the State's pretrial motions. *See* Rule 12–216(A) NMRA 1998; *cf. State v. Lopez,* 105 N.M. 538, 544, 734 P.2d 778, 784 (Ct.App.1986) ("To preserve a claim of error for appellate review involving the admissibility of evidence, a party must make a timely objection."); *State v. Martin,* 90 N.M. 524, 527, 565 P.2d 1041, 1044 (Ct. App.1977) (appellate courts will not search the record to see if an issue was preserved where the defendant did not provide appropriate transcript references), *overruled in part on other grounds by State v. Wilson,* 116 N.M. 793, 796, 867 P.2d 1175, 1178 (1994).

{45} Because Defendant failed to preserve this issue, we can only review the admissibility of the hearsay evidence for plain or fundamental error. *See* Rule 12–216(B); *State v. Contreras,* 120 N.M. 486, 492, 903 P.2d 228, 234 (1995). In order to find either plain or fundamental error, however, we must be convinced that the admission of the evidence in question "creates grave doubts concerning the validity of the verdict." *State v. Lucero,* 116 N.M. 450, 453, 863 P.2d 1071, 1074 (1993) (citation and internal quotation marks omitted). Given that both Defendant and the State were afforded the opportunity to introduce statements made by the victim, and to impeach one another's witnesses with respect to the trustworthiness of these statements, neither form of error is present here. On the contrary, it appears that the district court's ruling was justified in light of the victim's unavailability due to her death, and, as we explain below, the relevance of her statements to the theories presented by both the State and Defendant concerning the motive for the killing.

### B. *Prior Acts of Defendant*

{46} Prior to trial, the State moved for admission of certain evidence concerning Defendant's prior violent acts toward the victim. Defendant moved to exclude such evidence. The district court ruled that the evidence was admissible under Rules 11–403 and 11–404(B) NMRA 1998, for the purpose of proving Defendant's motive for the killing. We conclude that the district court did not abuse its discretion in admitting this evidence.

{47} Under Rule 11–404(B), evidence of a defendant's prior acts is admissible to show proof of motive. *See Woodward,* 121 N.M. at 7–8, 908 P.2d at 237–38. At trial, the State presented the theory that Defendant had a motive for killing the victim because she rejected him and chose to marry Antillon, while Defendant presented the theory that Defendant had no motive for killing the victim because she loved him and was only seeing Antillon due to pressure from her family. Under these circumstances, evidence of the deterioration of Defendant's relationship with the victim, and the specific actions that gave her cause for rejecting him in favor of Antillon, directly addresses the motivational theories presented at trial. Thus, the trial court did not abuse its discretion by admitting this evidence under Rule 11–404(B). *See Woodward,* 121 N.M. at 8, 908 P.2d at 238.

{48} Under Rule 11–403, evidence may be excluded if its probative value is substantially outweighed by its prejudicial impact, the potential for confusion of the issues, or the danger of misleading the jury. "[D]etermining whether the prejudicial im-

pact of evidence outweighs its probative value is left to the discretion of the trial court." *State v. Wilson,* 117 N.M. 11, 17, 868 P.2d 656, 662 (Ct.App.1993). In determining whether the trial court has abused its discretion in applying Rule 11–403, the appellate court considers the probative value of the evidence, *see State v. Schifani,* 92 N.M. 127, 130, 584 P.2d 174, 177 (Ct.App.1978), but the fact that some jurors might find this evidence offensive or inflammatory does not necessarily require its exclusion, *cf. State v. Everitt,* 80 N.M. 41, 46, 450 P.2d 927, 932 (Ct.App. 1969) (holding that evidence admissible to show intent and preparation was not to be excluded even if it "may have had some inflammatory effect"). As we noted in our discussion of Rule 11–404(B), the evidence of Defendant's prior acts had significant probative value in assessing the theories about the motive for the killing that both sides presented at trial. Thus, it was reasonable for the district court to decide that the probative value of this evidence was not substantially outweighed by other considerations, and we conclude that the district court did not abuse its discretion in applying Rule 11–403. *See Schifani,* 92 N.M. at 129–30, 584 P.2d at 176–77.

## V. *Speedy Trial*

{49} On appeal, Defendant claims that his constitutional right to a speedy trial was violated because his trial did not occur until more than one year after he was arrested on the charge of murdering the victim. Defendant correctly notes that this right attached on the date of his arrest. *See Salandre v. State,* 111 N.M. 422, 425–26, 806 P.2d 562, 565–66 (1991). To determine whether Defendant's constitutional right to a speedy trial was violated, however, a reviewing court must consider four factors: (1) length of the delay; (2) reasons for the delay; (3) whether the defendant asserted his right to a speedy trial; and (4) whether the defendant suffered any prejudice. *See State v. Manzanares,* 1996–NMSC–028, ¶ 8, 121 N.M. 798, 918 P.2d 714 (requiring the application of "the four-factor balancing test from *Barker v. Wingo,* 407 U.S. 514, 530[, 92 S.Ct. 2182, 33 L.Ed.2d 101] (1972)").

{50} Defendant claims that he asserted his constitutional right to a speedy trial in his trial counsel's entry of appearance, and then complained of the State's delay in his discovery requests, in his motions to review the conditions of his release, and in his opposition to granting extensions of time under Rule 5–604 NMRA 1998. However, Defendant did not specifically invoke a ruling on whether the State violated his constitutional right to a speedy trial, and thus the district court had no occasion to weigh any of the *Barker* factors.

{51} Under these circumstances, we conclude that the issue was not preserved for appellate review. *See Manzanares,* 1996–NMSC–028, ¶ 7, 121 N.M. 798, 918 P.2d 714 ("An appropriate motion to protect constitutional speedy-trial rights ... must be presented in the first instance to the trial court...."); *State v. Valdez,* 109 N.M. 759, 763, 790 P.2d 1040, 1044 (Ct.App.1990) (noting that where the defendant does not raise the constitutional speedy-trial issue in the trial court, there is nothing for an appellate court to review); *cf. State v. Wilson,* 1998–NMCA–084, ¶ 18, 125 N.M. 390, 962 P.2d 636 (holding that the constitutional right to speedy trial does not provide an alternative basis for affirming a district court's dismissal of charges when the issue was not raised below). The issues of discovery, conditions of release, and extensions of time under Rule 5–604 are analytically distinct from the issue of whether Defendant's constitutional right to a speedy trial was violated, and a ruling on one of these issues does not necessarily imply a ruling on the other. *See State v. Eskridge,* 1997–NMCA–106, ¶ 2, 124 N.M. 227, 947 P.2d 502 (distinguishing analysis under six-month rule from analysis of constitutional speedy-trial issue); *State v. Tortolito,* 1997–NMCA–128, ¶ 16, 124 N.M. 368, 950 P.2d 811 (distinguishing review of conditions of release from analysis of constitutional speedy-trial issue).

{52} Moreover, "an appropriate motion to protect constitutional speedy-trial rights [requires] the weighing of factors that are factually based," *Manzanares,* 1996–NMSC–028, ¶ 7, 121 N.M. 798, 918 P.2d 714, and "[f]act-finding is a function of the district court," *Wilson,* 1998–NMCA–106, ¶ 18, 125

N.M. 390, 962 P.2d 636. To determine whether the delay in bringing Defendant to trial is "presumptively prejudicial" under the first *Barker* factor, a court must consider "the nature and complexity of the crime." *State v. Kilpatrick,* 104 N.M. 441, 444, 722 P.2d 692, 695 (Ct.App.1986). The question of the complexity of a case, however, "is best answered by a trial court familiar with the factual circumstances, the contested issues and available evidence, the local judicial machinery, and reasonable expectations for the discharge of law enforcement and prosecutorial responsibilities." *Manzanares,* 1996–NMSC–028, ¶ 9, 121 N.M. 798, 918 P.2d 714.

{53} "Where there is a doubtful or deficient record, every presumption must be indulged by the reviewing court in favor of the correctness and regularity of the [trial] court's judgment." *In re Ernesto M., Jr.,* 1996–NMCA–039, ¶ 19, 121 N.M. 562, 915 P.2d 318. Based on the limited record available to us due to Defendant's failure to invoke a ruling below, we must presume that Defendant's flight from the country two days after the discovery of the victim's body provides a reason for the delay in gathering evidence until after his arrest almost one year later. Also, we are not in a position to say that the delay in processing the DNA samples and other physical evidence gathered from Defendant after his arrest must weigh heavily against the State. As noted in *Tortolito,* 1997–NMCA–128, ¶¶ 10–13, 124 N.M. 368, 950 P.2d 811, allowing additional time for processing such evidence may increase the likelihood of an accurate result, and an accurate analysis may serve to exculpate the defendant. Thus, as in *Valdez,* 109 N.M. at 763, 790 P.2d at 1044, "[n]othing in the record suggests such a striking violation of the constitutional right to a speedy trial that it would be appropriate to consider that issue for the first time on appeal" under Rule 12–216(B).

## VI. *Prosecutorial Misconduct*

{54} Defendant claims that a statement the prosecutor made during closing argument and a question the prosecutor asked during the cross-examination of a defense witness constituted prosecutorial misconduct that denied him a fair trial. At trial, the prosecutor cross-examined Defendant's expert on criminal investigations concerning the use of a background check as an investigative tool.[2] During the State's rebuttal of Defendant's closing argument, the prosecutor reminded the jury of Antillon's testimony that he did not kill the victim and juxtaposed that testimony against Defendant's failure to make a similar statement during his trial testimony.[3] Defendant's trial counsel did not

---

**2.** The transcript of this cross-examination appears as follows:

> Q. Now, let's also talk about one of the areas you mentioned about inclination, and I take it that when you say you look at someone's inclination, you do a background check; is that correct?
> A. It should be done, yes.
> Q. And that background check includes looking at somebody's prior felony conviction history; is that correct?
> A. Yes.
> Q. And you know that of the numerous times that you've testified that that's not always admissible in court; is that correct?
> A. No, but it gives you an idea of the person that you're dealing with. What you're trying to do is develop that.
> Q. And that's—for you, as an investigator, that's an investigative tool?
> A. It's an investigative tool.
> Q. But you know as an expert testifying or even testifying as a case manager that you've not always been allowed to get into that history; is that correct?

> A. You can get into the history, but it may not be admissible in Court.

**3.** This portion of the State's rebuttal appears in the transcript as follows:

> Jaime Antillon told you that he was at work on the 20th of December. He came home at 3:30, he went directly to the victim's house, then he went to his own house. When she wasn't there he bathed, he came back, then he was with her family looking for her. Jaime Antillon was available for interview after interview from the police department. He went to the funeral. When he learned of her death he cried, he hit the wall. He looked into your eyes and said he did not kill [the victim]. He told you that he couldn't accept her death and that he had been in love with her, and he also told you that if she had chosen [Defendant] it would have made him sad, but he wanted her to be happy with whoever she chose.
>
> You did not get that kind of message from [Defendant]. He did not say he didn't do this. He did not look you in the eyes and say, "I did not kill [the victim]."

object to these aspects of the prosecutor's cross-examination or closing argument at trial.

{55} "Failure to make a timely objection to alleged improper argument bars review on appeal, unless the impropriety constitutes fundamental error." *State v. Gonzales*, 113 N.M. 221, 229, 824 P.2d 1023, 1031 (1992). In this context, fundamental error arises when the prosecutor engages in misconduct that compromises the defendant's right to a fair trial. *See State v. Hennessy*, 114 N.M. 283, 287, 837 P.2d 1366, 1370 (Ct. App.1992), *overruled in part on other grounds by Lucero*, 116 N.M. at 453–54, 863 P.2d at 1074–75. Remarks by a prosecutor that directly comment on a defendant's invocation of the right to remain silent after receiving warnings under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), or on a defendant's failure to testify at trial, fall into this category of error. We review claims that such misconduct has occurred notwithstanding the lack of a timely objection. *See Hennessy*, 114 N.M. at 285–286, 837 P.2d at 1368–69. We agree with the Court of Appeals' perception that, in such cases, "the concepts of fair trial and substantial justice are identical." *Id.* at 287, 837 P.2d at 1370.

{56} Given that Defendant spoke with the arresting officer after receiving *Miranda* warnings and testified in his own defense at trial, the prosecutor's statement during closing arguments cannot be construed as a comment on Defendant's failure to testify or his invocation of the right to remain silent after his arrest. Rather, when taken in context, the prosecutor's statement appears to address the credibility of Defendant's trial testimony by contrasting the indirect manner in which he denied killing the victim with the more explicit denial offered by the victim's fiance. The prosecutor also appears to have used this contrast between the two witnesses to refute Defendant's argument that someone else, such as Antillon, must have been the killer. "The prosecutor may comment on the credibility of defense witnesses and on the lack of corroborating evidence of [a defendant's] alibi." *State v. Sanchez*, 120 N.M. 247, 254, 901 P.2d 178,

185 (1995). Thus, we cannot say that the prosecutor's statement during closing arguments rose to the level of fundamental error.

{57} The prosecutor's cross-examination of Defendant's expert on criminal investigations also does not amount to fundamental error. When taken in context, the prosecutor's questions appear to serve the legitimate purpose of eliciting testimony regarding the basis for the defense expert's claim that the police did not use the proper techniques of investigating the victim's murder. In context, the prosecutor's conduct cannot be construed as an improper effort to introduce evidence of Defendant's prior conviction because the prosecutor did not mention Defendant by name or specify his prior crime. Indeed, the prosecutor specifically alerted the witness to the possibility that such information may not be admissible in court. *Cf. State v. Stills*, 1998–NMSC–009, ¶¶ 47–49, 125 N.M. 66, 957 P.2d 51 (concluding that trial court did not abuse its discretion in finding no prosecutorial misconduct where the witness could have answered the prosecutor's question without giving details of a prior incident that had been ruled inadmissible). Thus, we find no merit to Defendant's claims of prosecutorial misconduct.

## VII. *Discovery Rules*

{58} Defendant next contends that the State breached its duty under Rule 5–501 by delaying the disclosure of its scientific analysis of physical evidence and information its investigators had received from a confidential FBI informant. Defendant contends that this untimeliness prejudiced the preparation of his defense and requires reversal of his convictions. We disagree.

{59} In evaluating whether the State's delay in disclosing evidence to a defendant requires reversal, we consider the following factors: "(1) whether the State breached some duty or intentionally deprived the defendant of evidence; (2) whether the improperly non-disclosed evidence was material; (3) whether the non-disclosure of the evidence prejudiced the defendant; and (4) whether the trial court cured the failure to timely disclose the evidence." *State v.*

454

*Mora,* 1997–NMSC–060, ¶ 43, 124 N.M. 346, 950 P.2d 789 (citing *State v. Sandoval,* 99 N.M. 173, 655 P.2d 1017 (1982)). In this case, we determine that the State did not breach its duty or intentionally deprive Defendant of its test results for the physical evidence in question, and Defendant has not shown that he was prejudiced by any delay in obtaining non-privileged information received from the confidential informant.

{60} Rule 5–501(A)(4) generally imposes a duty on the State to disclose the results of scientific tests within ten days of defendant's arraignment if they are within the possession, custody or control of the State. However, "courts ... have been sympathetic to the need for extended periods of time for testing DNA evidence," particularly when it may exculpate the subject of the analysis. *See Tortolito,* 1997–NMCA–128, ¶ 10, 124 N.M. 368, 950 P.2d 811. In this case, the test results were not in the State's possession until August 1996, at which time the State presented them to defense counsel. The record indicates that the delay in conducting the scientific tests was caused by a combination of factors, including Defendant's unavailability prior to his arrest, the State's workload, and the complexity of the testing itself. Under these circumstances, the State did not breach its duty under Rule 5–501 to disclose test results in a timely fashion once they were available. For this reason, we conclude that this issue has no merit.

{61} Under Rule 5–501(E)(1), the State is not required to disclose material that will expose a confidential informant. *See also* Rule 11–510(A) (recognizing the State's privilege not to disclose a confidential informant). Despite these rules, Defendant obtained information from pretrial interviews that indicated police had received tips from two confidential informants. As noted earlier in our discussion of Rule 11–510, these tips did not exculpate Defendant and were conveyed through multiple layers of hearsay. The district court denied disclosure of one informant's identity because Defendant failed to show that such disclosure was relevant and helpful to his defense or necessary to a fair determination of his guilt or innocence. Defendant knew the other informant's identi-

ty and had at least two months before trial to develop this informant's testimony. Under these circumstances, Defendant has not shown that he was prejudiced by any delay in obtaining any information about tips from confidential informants that was not protected against disclosure under Rules 5–501(E)(1) or 11–510(A). *Cf. Mora,* 1997–NMSC–060, ¶ 44, 124 N.M. 346, 950 P.2d 789 (noting circumstances in which failure to timely disclose evidence may be cured by the trial court). Therefore, the discovery rules do not provide a basis for reversal of Defendant's convictions.

## VIII. *Ineffective Assistance of Counsel*

{62} Defendant claims his trial counsel rendered ineffective assistance by failing to (1) make proper and necessary objections before and at trial, (2) file a motion to suppress evidence in a timely manner, and (3) file briefs requested by the trial court on evidentiary issues. To establish a prima facie case that these alleged failures resulted in ineffective assistance of counsel, Defendant "must show that his attorney's conduct fell below that of a reasonably competent attorney and that the ineffective performance prejudiced him." *Baca,* 1997–NMSC–059, ¶ 24, 120 N.M. 383, 902 P.2d 65. " 'A prima facie case is not made when a plausible, rational strategy or tactic can explain the conduct of defense counsel' in this case." *Id.* ¶ 25 (quoting *State v. Richardson,* 114 N.M. 725, 729, 845 P.2d 819, 823 (Ct.App.1992)).

{63} As noted earlier in our discussion of Defendant's evidentiary objections, Defendant's trial counsel stated on the record at trial that he was not objecting to certain testimony "for tactical reasons." Further, as noted in the record concerning Defendant's pretrial motion for admission of statements made by the victim to Defendant and his family, Defendant's failure to object served the tactical purpose of allowing his defense to exploit the same hearsay exceptions that the State was using. Thus, a plausible, rational strategy or tactic can explain the conduct of Defendant's counsel, and his failure to object does not establish a prima facie case of ineffective assistance.

{64} The record discloses that Defendant's trial counsel filed and argued numerous motions to admit or exclude certain categories of evidence. The fact that Defendant's trial counsel did not pursue every possible motion, or made the decision to spend finite resources pursuing certain issues rather than others, does not mean that his trial counsel's performance fell below the standard of a reasonably competent attorney. "We need not decide whether he was right. We must only decide whether a reasonably competent attorney might have reasoned and concluded as he did." *Id.* ¶ 36. Given that several of the issues Defendant's trial counsel chose to pursue ultimately were resolved in his favor, we cannot say that a reasonably competent attorney would not have made the same choices, much less that these choices reflect a deficient performance that prejudiced the defense. Hence, Defendant has not established a prima facie case that he received ineffective assistance of counsel.

## IX. *Cumulative Error*

{65} Defendant's final contention is that his convictions should be overturned because the district court made numerous errors, which had the cumulative effect of denying him a fair trial. *See Baca*, 120 N.M. at 392, 902 P.2d at 74. We conclude from our review of the record, however, that any errors made by the district court were too slight to have the cumulative effect of denying Defendant a fair trial. *See Woodward*, 121 N.M. at 12, 908 P.2d at 242. Therefore, the doctrine of cumulative error does not apply here.

## X. *Conclusion*

{66} We affirm Defendant's convictions for murder and tampering with evidence. We reverse Defendant's conviction for kidnapping, and we remand for resentencing consistent with this opinion.

{67} **IT IS SO ORDERED.**

FRANCHINI, C.J., and BACA, SERNA, and McKINNON, III, JJ., concur.