This memorandum opinion was not selected for publication in the New Mexico Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

**v.**                                                                            **No. 30,129**

**NEHEMIAH L.,**

Child-Appellant.

**APPEAL FROM THE DISTRICT COURT OF SAN JUAN COUNTY**
**William C. Birdsall, District Judge**

Gary K. King, Attorney General
Santa Fe, NM

for Appellee

Hugh W. Dangler, Chief Public Defender
Susan Roth, Assistant Appellate Defender
Santa Fe, NM

for Appellant

**MEMORANDUM OPINION**

**SUTIN, Judge.**

Nehemiah L. (Child) appeals from the judgment and disposition, convicting him upon a conditional guilty plea of receiving or transferring a stolen vehicle and

shoplifting. [RP 75] In his plea and disposition agreement, Child reserved the right to appeal the district court's denial of his motion to suppress. [RP 70] Child raises two issues, contending that the district court erred in denying the motion to suppress, because: (1) after the arresting officer determined that Child was involved in a car crash, his protections under NMSA 1978, Section 32A-2-14 (2003) (amended 2009) (discussing the basic rights of a child subject to the Delinquency Act) were triggered when Child was first questioned by police in the hospital emergency room without being advised of his right to remain silent; and (2) after Child invoked his constitutional and statutory rights during the second interview by asking to have his aunt present, the arresting officer continued questioning Child. [DS 5-6]

This Court's calendar notice proposed summary affirmance. [CN 1] Child filed a memorandum in opposition that we have duly considered. [MIO] Unpersuaded, however, we affirm.

**DISCUSSION**

In *State v. Javier M.*, 2001-NMSC-030, ¶ 1, 131 N.M. 1, 33 P.3d 1, our Supreme Court addressed whether Section 32A-2-14 provides children with broader rights than those guaranteed by *Miranda v. Arizona*, 384 U.S. 436 (1966). The Supreme Court determined that the statute did provide a child broader rights, holding that the protections are triggered when a child is subject to investigatory detention.

After careful analysis, we find that Section 32A-2-14 evinces a legislative intent to expand the rights of children beyond those embodied in *Miranda* jurisprudence. Thus, we conclude that a child need not be under custodial interrogation in order to trigger the protections of the statute. Instead, we find that the protections are triggered when a child is subject to an investigatory detention. Therefore, Section 32A-2-14 requires that, prior to questioning, a child who is detained or seized and suspected of wrongdoing must be advised that he or she has the right to remain silent and that anything said can be used in court. If a child is not advised of the right to remain silent and warned of the consequence of waiving that right, any statement or confession obtained as a result of the detention or seizure is inadmissible in any delinquency proceeding.

*Javier M.*, 2001-NMSC-030, ¶ 1.

At the suppression hearing, the State presented evidence that at about 9:47 a.m. on April 25, 2009, New Mexico Police Officer Gary Chavez arrived at a one-car crash site between Albuquerque and Farmington, New Mexico. [RP 31] There was severe damage to the vehicle, the vehicle had rolled over, and blood was found at the scene. [DS 2] There were no persons found at the accident scene, however, but the officer knew that someone was injured. [Id.]

**A. Officer Smith's Initial Encounter with Child.** On the same day at 2:19 p.m., New Mexico Police Officer Jeff Smith was dispatched to the emergency room at San Juan Regional Medical Center. [RP 31] Dispatch advised that two males were admitted to the emergency room for injuries sustained in a single vehicle crash that morning. [Id.] The officer was assigned to get statements from the two people in order to finish a traffic crash report. [DS 2] At the hospital, the officer was advised

3

that the two people involved in the crash were in emergency rooms 4 and 6. [DS 3] The officer asked if he could interview the two people, and he was told by the nurse that they were both awake and alert but should not be moved. [Id.] Child was wearing a neck brace and had an intravenous needle in his arm. [Id.] The officer asked Child if he was involved in a car crash. [Id.] The officer asked Child who the vehicle belonged to, and Child told him that it belonged to his sister's boyfriend. [Id.] Child also told the officer that he and his brother took the vehicle from his sister's home in Albuquerque. [Id.] While driving around Albuquerque, they came near a bus stop and a black man offered them cash for a ride to Farmington. [Id.] They picked up the man and somewhere north of Cuba, the man began driving. [Id.] Child was a passenger and asleep when the rollover crash occurred. [DS 3-4; RP 32] The officer did not read *Miranda* warnings to Child and did not record the interview. [DS 3] After interviewing Child, the officer talked to Child's brother whose statements corroborated Child's statements. [*See also* RP 31-32]

**B. Officer Smith's Second Encounter with Child.** After leaving the hospital, dispatch notified the officer that Brandon Jose, Child's sister's boyfriend, had reported his vehicle as stolen that morning. [RP 32] Officer Smith went back to the hospital to re-interview Child and his brother. [DS 4] Child was still there but his brother had been discharged. [Id.] As the docketing statement states, "[a]t this second interview,

[the officer] believed he had suspicion of a crime and read 'children's rights[] warnings' to [Child] and recorded the interview." [DS 4] The docketing statement further states that Child asked to have his aunt present, told the officer that his aunt was on her way but that he did not know her telephone number, and the officer began questioning "despite . . . Child's request to have his [a]unt present." [Id.] Child then told the officer that he was staying with the owner of the car, he took the keys, he and his brother took the vehicle, drove around Albuquerque, met the unidentified man who offered them cash for a ride to Farmington, on the way they let him drive, and the crash occurred. [DS 4-5] Child was arrested and charged with receiving or transferring a stolen vehicle. [Id.]

The State's response to Child's motion to suppress, however, states that Child did not adamantly request that his aunt be present. [RP 53] Rather, the officer testified that Child merely inquired about whether his aunt would qualify as a "parent, guardian, or custodian," saying "What about my aunt?" [Id.] The officer then asked Child several questions, including the name of the aunt, what her phone number was, and where she had gone. [Id.] Child did not have his aunt's phone number, and there was no way to contact her. [Id.] The officer then testified that, thereafter, Child, who was 17 years old at the time, stated that he understood his rights and the warnings and agreed to talk to the officer anyway. [RP 53 (¶ D)(iii), 52 (¶ D)(ii)]

**C. Child's Memorandum.** In his memorandum, with regard to the first interview, Child states that Officer Smith was investigating a serious rollover car crash. [MIO 1] Child points out that he was not given any *Miranda* warnings, and in response to questioning, Child told the officer that he and his brother took a mini-van from Albuquerque belonging to his sister's boyfriend. [Id.] With regard to the second interview, Child indicates that Officer Smith admitted that Child was under investigation and read him his *Miranda* warnings. [Id.] Child also reiterates that there was testimony that Child asked if his aunt counted as a parent or guardian, and asked to have his aunt present, but was unable to produce a phone number to contact her. [Id.] The memorandum states that Child "waived his rights." [Id.] Child further argues that because the officer failed to inform Child that his earlier statement could not be used against him, due to his immaturity and lack of experience, Child felt obligated during the second interview to repeat the answers to the same questions. [MIO 2] As such, Child argues, "the second confession was involuntary, as it was the result of the prior influence from the first improper investigation where . . . Child also confessed." [Id.] Thus, Child continues to argue that he was "in *Miranda* custody when he made incriminating statements the first time he was questioned." [MIO 4]

6

Child further points out that although he was not physically restrained by the officer, he was physically restrained to the bed and isolated in a room and that "no reasonable person would feel free to leave or terminate the encounter under these circumstances." [MIO 5] Child also argues that he was not free to leave when the officer stood over him while Child lay prone with a neck brace. [MIO 7] Child further argues that even if the officer did not know whether Child was involved in receiving or transferring a stolen vehicle when he first questioned Child, the officer was still investigating potential criminal conduct for his crash report, such as whether the driver was under the influence of drugs or alcohol. [MIO 7-8] Thus, Child asserts, the officer was obliged to tell Child that any statement he made in the first interview could not be used against him, and because Child was unaware of the effect of the first interview, his waiver during the second interview was unknowing and involuntary. [MIO 8, 9] Finally, Child contends that the police prevented a knowing and voluntary waiver of rights by excluding his aunt from the second interrogation. [MIO 12] Child argues that the officer made no effort to locate the aunt, which supports his argument that his waiver was not knowingly, intelligently, or voluntarily made. [Id.] Because he was unaware of the effect of the first interview, according to Child, his waiver during the second interrogation was unknowing and not voluntary. [Id.] We are not persuaded.

7

**D. Analysis.** Child's contentions on appeal rest on the assertion that Officer Smith was required to give Child *Miranda* warnings prior to questioning him in the first interview. As we discussed in our calendar notice, however, the first interview occurred prior to the officer's learning that the vehicle was stolen. The officer interviewed Child in order to complete a traffic crash report. There is no evidence that Child was suspected of driving the vehicle under the influence of drugs or alcohol. Child told the officer that he was asleep and not driving when the rollover occurred. Moreover, as mentioned earlier, when the officer asked Child who owned the vehicle and Child responded that the vehicle belonged to his sister's boyfriend, the officer had not yet learned that Child's sister's boyfriend had reported that the vehicle was stolen. Thus, the purpose of the first interview was not to investigate Child's involvement in a crime.

Child was 17 years old at the time; he was awake and alert. Although he could not leave the hospital at that moment because he was undergoing emergency treatment, Child was in a public place surrounded by medical personnel should he have had need of assistance or should he have preferred not to talk to or answer the officer's questions. We remain persuaded that during the first interview, Child was not the subject of or subject to investigatory detention. Accordingly, the Section 32A-2-14 protections were not triggered when Child was first questioned by police

8

in the hospital emergency room without being advised of his right to remain silent and without being advised that the statements he made could be used against him. As such, because the officer was not required to advise Child of his rights with regard to the first interview, there is no prior improper influence that otherwise tainted the knowing and voluntary nature of Child's waiver of his rights with regard to the second interview.

During the second interview, the officer recognized that Child was now the subject of a stolen vehicle investigation. Therefore, the officer correctly advised Child of his Section 32A-2-14 rights and appropriately recorded the interview. Moreover, Child then validly waived his rights and spoke to the officer about stealing the vehicle. To the extent Child argues that the officer refused to contact Child's aunt, evidence was presented that Child did not know how to contact his aunt, and he then proceeded to waive his rights. To the extent that Child asserts that he adamantly requested his aunt's presence, the officer presented conflicting testimony from which the district court, as fact finder, could conclude otherwise. *See State v. Martinez*, 1999-NMSC-018, ¶ 20, 127 N.M. 207, 979 P.2d 718 (stating that "there is no due process requirement that the juvenile's parents be notified for the waiver to be valid. . . . Rather, the lack of parental notification is one factor to consider in the totality of the circumstances" (alteration omitted) (omission in original) (internal quotation marks

9

and citation omitted)); *State v. Salas*, 1999-NMCA-099, ¶ 13, 127 N.M. 686, 986 P.2d 482 (recognizing that it is for the fact finder to resolve any conflict in the testimony of the witnesses and to determine where the weight and credibility lay); *see also State v. Rojo*, 1999-NMSC-001, ¶ 19, 126 N.M. 438, 971 P.2d 829 (filed 1998) (stating that "[c]ontrary evidence supporting acquittal does not provide a basis for reversal because the jury is free to reject [the d]efendant's version of the facts").

**CONCLUSION**

For the foregoing reasons, we affirm the district court's order denying Defendant's motion to suppress.

**IT IS SO ORDERED.**

_____
**JONATHAN B. SUTIN, Judge**

**WE CONCUR:**

_____
**RODERICK T. KENNEDY, Judge**

_____
**LINDA M. VANZI, Judge**