This memorandum opinion was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.        **No. 34,270**

**JERARDO CASTILLO,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF LEA COUNTY**
**Mark Sanchez, District Judge**

Hector H. Balderas, Attorney General
Santa Fe, NM
Charles J. Gutierrez, Assistant Attorney General
Albuquerque, NM

for Appellee

Templeman and Crutchfield
C. Barry Crutchfield
Lovington, NM

for Appellant

**MEMORANDUM OPINION**

**SUTIN, Judge.**

**{1}** Following a jury trial, Defendant Jerardo Castillo was convicted of kidnapping, aggravated battery against a household member with a deadly weapon, and aggravated assault against a household member with intent to commit a violent felony. On appeal, Defendant challenges only his kidnapping conviction and raises two issues: (1) whether sufficient evidence of confinement was presented in support of his kidnapping conviction; and (2) whether the conduct underlying Defendant's kidnapping conviction was merely incidental to the commission of the aggravated battery and assault. We affirm.

**BACKGROUND**

**{2}** This case arises from a series of events that occurred between July 8 and 18, 2012. Victim was living in Albuquerque in July 2012, and she and Defendant had previously been in a relationship. In an effort to reconcile with Defendant, Victim went to Hobbs to arrange a birthday party for him. On July 9, the morning Victim arrived in Hobbs, she and Defendant began to argue, and Defendant burned her hand with a hot clothes iron. Shortly thereafter, on the same day, Defendant took Victim into the bathroom of his home and held a pistol inside her mouth with his finger on the trigger while interrogating her about whether she had been unfaithful to him. Apart from this specific conduct that took place on July 9, throughout the time Victim was in Hobbs, Victim was subjected to continuous physical and psychological abuse by

Defendant. Further relevant facts are discussed in more detail in this Opinion as they pertain to Defendant's issues on appeal.

**ARGUMENT**

**I.    Sufficient Evidence of Confinement Was Presented to Support Defendant's Kidnapping Conviction**

{3}    Defendant argues that there was insufficient evidence presented to support his kidnapping conviction, specifically with respect to the element of confinement.

{4}    "Substantial evidence review requires analysis of whether direct or circumstantial substantial evidence exists and supports a verdict of guilt beyond a reasonable doubt with respect to every element essential for conviction. We determine whether a rational fact[-]finder could have found that each element of the crime was established beyond a reasonable doubt." *State v. Kent*, 2006-NMCA-134, ¶ 10, 140 N.M. 606, 145 P.3d 86 (citations omitted). To convict Defendant of kidnapping, the State was required to prove:

>      1.    . . . [D]efendant confined [Victim] by force or intimidation;
>
>      2.    . . . [D]efendant intended to hold [Victim] against [Victim's] will: to inflict death or physical injury on [Victim];
>
>      3.    This happened in New Mexico on or between the 8th and the 18th days of July[] 2012.

3

*See* NMSA 1978, § 30-4-1 (2003); UJI 14-403 NMRA; *see also State v. Smith*, 1986-NMCA-089, ¶ 7, 104 N.M. 729, 726 P.2d 883 ("Jury instructions become the law of the case against which the sufficiency of the evidence is to be measured.").

{5} Because Defendant challenges only the sufficiency of the evidence presented with respect to the confinement element of kidnapping, we focus our analysis on this element. In support of his contention, Defendant argues that the evidence presented at trial with respect to this element was insufficient for four reasons: (1) that Victim initiated the travel to Hobbs to arrange a birthday party for Defendant; (2) upon arrival in Hobbs, Victim said that "she was staying" and "wanted to be here with [Defendant]"; (3) that Defendant never told Victim that she could not leave his house, and Victim did travel outside of the home; and (4) that Victim had a cell phone but never sought help from law enforcement or other people during the time she was in Hobbs. For the reasons discussed in this Opinion, we disagree. We hold that over the period that Victim was in Hobbs, Defendant engaged in a continuous pattern of physical abuse, punctuated by psychological abuse, that had the effect of intimidating Victim into being too afraid to leave, effectively confining Victim.

{6} Victim testified that Defendant and his cousin drove Victim and Victim's son from Albuquerque to Hobbs. They left Albuquerque the night of July 8 and arrived in Hobbs early the next morning. The morning Victim arrived in Hobbs, on July 9,

4

Defendant and Victim began arguing as Defendant was ironing his clothes on the kitchen table. When Victim told Defendant that he should change his life and be more careful, Defendant became angry and accused Victim of infidelity and of not caring about him while he was recently away.[1] Defendant became upset and burned Victim on her hand with the hot iron. This conduct served as the basis for Defendant's aggravated battery conviction. *See* NMSA 1978, § 30-3-16(C) (2008) (setting forth the crime of aggravated battery against a household member with a deadly weapon).

{7}     Shortly thereafter, also on July 9, Defendant began hitting Victim. Victim asked that Defendant take her into a different room so that Victim's son, who was in the living room watching television, would not witness the hitting. Defendant and Victim went into the bathroom, where Defendant again accused Victim of infidelity while he was away. Defendant placed the barrel of a handgun in Victim's mouth and made her suck on the gun in a manner simulating fellatio. Defendant angrily held the gun with his finger on the trigger with such pressure in Victim's mouth that Victim was frightened that the gun would accidentally fire. During this time, Victim heard a voice outside, and Defendant told Victim that there were people digging a hole to bury her. Victim was scared that if she screamed, she would be hit more. This conduct served

---

[1] Defendant had been incarcerated and recently released, which was not mentioned at trial. Victim's testimony referred to Defendant as being "away."

5

as the basis for Defendant's aggravated assault conviction. *See* NMSA 1978, § 30-3-14 (1995) (setting forth the crime of assault against a household member with intent to commit a violent felony).

**{8}** Hoping that the abuse from the morning would not recur, Victim still wanted to reconcile with Defendant and host Defendant's birthday party because that was the reason she went to Hobbs. Also on July 9, Victim and her son went shopping with Defendant's sister, Sally Prieto, to buy food for the barbeque. They returned to Ms. Prieto's house to wait for Defendant's arrival, and eight of Defendant's family members also arrived. Ultimately, the barbeque did not happen because upon Defendant's arrival at Ms. Prieto's house, another physical altercation took place between Victim and Defendant. In Ms. Prieto's front yard, where no one else was present, Defendant choked Victim until she blacked out; by the time Victim regained consciousness, she saw other family members nearby, but nobody offered help. Defendant and Victim left Ms. Prieto's house after the choking, and Victim felt that she "had to go with [Defendant.]" Victim left her son at Ms. Prieto's house for a couple of hours so that he would not have to witness any additional abuse. Victim was afraid that if she tried to run away, Defendant would catch her because she could not outrun him and the beating would become worse. Victim could not recall where

Defendant took her after they left Ms. Prieto's house, but they returned to Ms. Prieto's house to pick up Victim's son before eventually going back to Defendant's home.

**{9}** Separate from the acts of Defendant burning Victim with a clothes iron and putting a pistol in her mouth, Victim testified she was subjected to continuous physical and psychological abuse by Defendant throughout the remainder of her stay in Hobbs. After they left Ms. Prieto's house on July 9, Victim and Defendant made up, and Victim testified that she wanted to believe that the abuse was over. However, this was not the case, and until Victim left Hobbs, Defendant beat Victim for "hours" at a time, subsequently passing out because he was so tired from beating her. When Defendant was passed out, Victim said she had to remain lying down next to him because if she did not, she was afraid Defendant would think she was trying to leave and the abuse would start again. Victim testified that she did not think she could run away with her young son without Defendant catching her. When Defendant awoke, Defendant and Victim would have sex, and "it would be okay for a couple more hours." However, something would trigger Defendant's anger, and he would again beat Victim repeatedly. Victim characterized the beating as occurring in a deliberate manner that was "slow" and "not [] constant," on-going for hours, and punctuated by repeated questions about whether Victim had been unfaithful to Defendant while he was away. If Victim answered in the negative, she would be hit again because

Defendant thought she was lying. Victim was not allowed to talk, fight back, argue, or ask Defendant questions while the abuse was ongoing. Victim testified that Defendant "had a gun the whole time."

{10} Apart from the use of the iron on July 9, Victim also testified that Defendant used other weapons to inflict physical abuse: a police baton, a curtain rod, and a torch. On one occasion, Defendant pushed Victim into a wall in the bedroom of his home, resulting in a hole in the wall. After Victim fell onto the bed, Defendant used the baton to choke her. Using his hands, Defendant also choked Victim on multiple other occasions and caused Victim to almost pass out each time.

{11} On a different day, towards the end of her ten days in Hobbs, Victim testified that Defendant used a curtain rod, folded in half, to beat her on her left leg from the waist down while she was lying down on the floor of the bedroom, causing long-lasting bruising. Although Victim tried to scoot across the floor to get away, Defendant slid across the floor and continued to hit her with the rod. Additionally, Defendant used a gas torch to threaten Victim, placing the torch close to Victim's body to scare her. If Victim moved, Defendant would put the torch closer to her skin. In one instance, Defendant burned Victim's left forearm with the torch, leaving a mark.

{12} Victim testified that she never left Defendant's home alone after July 9 and only left on a couple of occasions with Defendant to visit Defendant's friends and family. Victim testified that she was never allowed to leave the house by herself. Defendant offered money and his car keys to Victim and told her to "go get the fuck out of here," but Victim testified that if she had tried to get the keys, he "would fuck [her] up" and that it was a trick. Victim said that there was no way she would have grabbed the keys because she was too afraid of being beaten up. Even though Defendant had male visitors at his home, Victim would stay in the bedroom while they were there so that Defendant would not accuse her of looking at the visitors and wanting to have sex with them and begin beating her again.

{13} On July 18, Victim convinced Defendant to drive her and her son back to Albuquerque so she could attend a court date pertaining to her apartment. During the drive to Albuquerque, Defendant again hit Victim and tried to burn her with the gas torch when Victim said that she knew of an alternate route to Albuquerque, which, according to Defendant, meant that Victim had been unfaithful to him with another man in Hobbs. Upon arrival in Albuquerque, Defendant ate and fell asleep. Although Victim had missed her court date, she pretended that she still had to go. Victim did not think Defendant would let her go by herself, so her original plan was to go with Defendant to explain to the judge why she did not make it, allowing the judge to see

9

her bruised appearance. However, because Defendant was falling asleep, Victim asked him if she could drive herself to court in his truck, and Defendant nodded his head groggily. Victim went directly to the Albuquerque Police Department and was eventually helped by the New Mexico State Police.

{14} Victim testified that due to Defendant's abuse, she was terrified the entire time she was in Hobbs. She stated that she was "scared to death"—so scared that she "[could not] even move, think right, breathe right, [and did not] know what [she was] saying." The State also presented corroborating testimony from Sergeant Elizabeth Whitfield of the New Mexico State Police, who interviewed Victim, and SANE nurse Mary Anne Chavez, who conducted an examination of Victim, as well as photographic evidence of Victim's physical injuries and extensive bruising. Both Sergeant Whitfield and Nurse Chavez testified that based on the coloration of Victim's bruising, the bruising was in varying stages of healing.

{15} The evidence discussed here, primarily in the form of Victim's testimony, amply provides that through physical force and psychological abuse, Defendant intimidated Victim and scared Victim into thinking that if she tried to leave, Defendant would employ greater physical force against her, effectively confining Victim. *See State v. Clark*, 1969-NMSC-078, ¶ 7, 80 N.M. 340, 455 P.2d 844 (explaining that the force needed to accomplish a kidnapping need only be minimal

and need not necessarily be violent or deadly); *State v. Laguna*, 1999-NMCA-152, ¶ 10, 128 N.M. 345, 992 P.2d 896 ("Intimidation includes 'putting in fear.' Intimidation may result from words or conduct. Intimidation creates an apprehension of danger of bodily harm while also reducing the victim's ability to resist the advances toward that harm." (citations omitted)).

**{16}** We conclude that the foregoing constitutes sufficient evidence by which a rational jury could find that Defendant confined Victim by force or intimidation. *See State v. Parvilus*, 2013-NMCA-025, ¶ 33, 297 P.3d 1228 (holding that there was sufficient evidence of kidnapping where the defendant was armed with a knife and two guns and surveillance photos showed the victim entering a motel room with the defendant because "the jury could reasonably infer that [the v]ictim did not leave the apartment and accompany [the d]efendant to the motel willingly because he feared that [the d]efendant might use one of the handguns if he tried to escape"), *overruled on other grounds by* 2014-NMSC-028, 332 P.3d 281; *see also State v. Dominguez*, 2014-NMCA-064, ¶¶ 3, 12, 327 P.3d 1092 (holding that there was sufficient evidence of force and intimidation to support a kidnapping conviction, apart from a conviction for criminal sexual penetration in the second degree, when the defendant pulled a gun out of his sweatshirt, put the gun to the victim's head, and stated that he planned to rape the victim, also threatening to kill the victim's young daughter if the victim did

not comply); *Laguna*, 1999-NMCA-152, ¶ 11 (holding that a jury could reasonably infer that a kidnapping victim was transported or confined by intimidation where the victim did not think the defendant would let him exit the vehicle, the victim was in fear that the defendant would rape him, and the defendant was an adult who was controlling the moving vehicle while the victim was a "young teenager"); *cf. State v. Muise*, 1985-NMCA-090, ¶ 22, 103 N.M. 382, 707 P.2d 1192 (explaining, in the context of false imprisonment, that restraint "may arise out of words, acts, gestures[,] or similar means [that] result in a reasonable fear of personal difficulty or personal injuries if the victim does not submit").

{17} Relevant to this, we briefly address Defendant's contention that the district court made a finding at the close of the State's case that the evidence presented by the State "did not rise to proof 'beyond a reasonable doubt' " and that this finding reflects that the evidence of confinement was insufficient. Specifically, the brief in chief states that when the district court denied Defendant's motion for a directed verdict, the court found that "there is enough evidence which is . . . not beyond a reasonable doubt." Defendant's brief in chief notes for a second time "that the finding of the [district c]ourt that the evidence at the close of the State's case did not rise to proof 'beyond a reasonable doubt[,]' " according to Defendant, reflects that there was insufficient evidence of confinement. The State's answer brief disputes Defendant's factual

12

recitation, instead explaining that the district court, in denying the directed verdict motion, was reiterating the appropriate standard to apply when ruling on such a motion, not making a statement on the State's ability to ultimately meet its burden of proof. This Court's review of this portion of the testimony comports with the State's factual recitation, and as such, we do not further address Defendant's contention.

**{18}** We turn next to Defendant's contentions that Victim's travel to Hobbs was voluntary and that Victim stated she wanted to be in Hobbs with Defendant. It is undisputed that Victim voluntarily initiated travel to Hobbs and stated that she initially had a desire to reconcile with Defendant. Victim further testified that she wanted to throw a birthday party for Defendant. However, the fact that Victim initiated the travel to Hobbs and originally wanted to stay with Defendant with the intent to reconcile does not negate the fact that a jury could have reasonably concluded that at some point during Victim's stay in Hobbs, her association with Defendant was no longer voluntary and Defendant confined Victim by force or intimidation. *See State v. Jacobs*, 2000-NMSC-026, ¶ 24, 129 N.M. 448, 10 P.3d 127 ("A kidnapping can occur when an association begins voluntarily but the defendant's actual purpose is other than the reason the victim voluntarily associated with the defendant."); *Laguna*, 1999-NMCA-152, ¶ 10 ("While there does not appear to be any evidence of intimidation in getting [the victim] into the car, the evidence of what occurred during the ride could

13

reasonably lead the fact[-]finder to conclude that [the d]efendant intimidated [the victim] during transportation."). The jury could have reasonably inferred that Victim's confinement began at some time after July 9, at the point when Victim realized that Defendant's actions on July 9 were not isolated incidents. *See State v. Pisio*, 1994-NMCA-152, ¶ 30, 119 N.M. 252, 889 P.2d 860 ("The key to the restraint element in kidnapping is the point at which [the v]ictim's physical association with [the d]efendant was no longer voluntary."); *State v. Mares*, 1991-NMCA-052, ¶¶ 3, 20-21, 112 N.M. 193, 812 P.2d 1341 (holding that a jury could reasonably infer that the victim was no longer voluntarily with the defendant at the moment the defendant became angry after the victim "repelled" the defendant's sexual advances).

{19}    To the extent Defendant argues that the jury should have believed his version of the events—that Victim was determined to reconcile with Defendant and called the police upon realizing there would be no rekindled relationship—we disagree. *See State v. Rojo*, 1999-NMSC-001, ¶ 19, 126 N.M. 438, 971 P.2d 829 ("Contrary evidence supporting acquittal does not provide a basis for reversal because the jury is free to reject [the d]efendant's version of the facts."); *State v. Salas*, 1999-NMCA-099, ¶ 13, 127 N.M. 686, 986 P.2d 482 (recognizing that it is for the fact-finder to resolve any conflict in the testimony of the witnesses and to determine where the weight and credibility lay). Contrary to Defendant's contentions, a rational jury could

14

have reasonably concluded that Victim contacted law enforcement as soon as she felt safe to do so, almost immediately upon her arrival in Albuquerque, where she knew the location of the police station.

{20} Similarly, although Defendant argues that Victim could not have been confined because she never sought assistance from law enforcement or any other person while she was in Hobbs, we disagree. Defendant has pointed us to no authority supporting his contention that Victim was required to seek help to prove confinement, and we are unaware of any. *In re Adoption of Doe*, 1984-NMSC-024, ¶ 2, 100 N.M. 764, 676 P.2d 1329 ("[The appellate courts] have long held that to present an issue on appeal for review, an appellant must submit argument and authority as required by rule. [The reviewing courts] assume where arguments in briefs are unsupported by cited authority, counsel after diligent search, was unable to find any supporting authority. [The appellate courts] therefore will not do this research for counsel. Issues raised in appellate briefs [that] are unsupported by cited authority will not be reviewed . . . on appeal." (emphasis and citations omitted)).

{21} The reasonableness of Victim's decision not to ask help from friends of Defendant and to remain next to Defendant in order to avoid further physical injury presents a fact question for the jury. Victim testified that if she was not lying beside Defendant after he fell asleep, she was afraid that Defendant would think she was

15

trying to escape and the physical abuse would start all over again. Victim also stated that she did not have friends or family of her own in Hobbs, and the only people she knew in Hobbs were friends or family of Defendant. Victim did not know the address of Defendant's home or the location of the police department in Hobbs, and was terrified Defendant would catch her. Victim observed surveillance cameras by the front door of Defendant's home, as well as a padlock on the outside of the front door. Victim also testified that she lost cell phone service starting around July 11. Based on Victim's testimony, a reasonable jury could have inferred that any attempt by Victim to obtain help or escape would have resulted in more serious physical injury. Accordingly, the fact that the jury returned a guilty kidnapping verdict indicates that the jury believed that Victim's response to the threat of increased violence by any attempt to leave Defendant's side was reasonable. It is not the role of the appellate court to second-guess the jury's factual determinations. *State v. Garcia*, 2011-NMSC-003, ¶ 5, 149 N.M. 185, 246 P.3d 1057 ("New Mexico appellate courts will not invade the jury's province as fact-finder by second-guessing the jury's decision concerning the credibility of witnesses, reweighing the evidence, or substituting its judgment for that of the jury." (alterations, internal quotation marks, and citation omitted)).

{22} To the extent Defendant argues that there was no evidence of confinement because Victim traveled outside of his home—specifically, to Defendant's sister's house for his birthday party, to visit Ashley Castillo, and to the home of Delores Rascon—and that Victim and Defendant made up on several occasions during Victim's ten-day stay, we disagree. The kidnapping statute, Section 30-4-1, does not require that the State prove Victim was "confined for a certain length of time"; rather, our case law notes that "the length of time involved in such restraint or confinement is immaterial." *State v. Clark*, 1969-NMCA-004, ¶ 18, 80 N.M. 91, 451 P.2d 995, *rev'd on other grounds by* 1969-NMSC-078, 80 N.M. 340, 455 P.2d 844. Because one count of kidnapping was charged for the July 8 to July 18 period, the State was required to prove that during this time, Defendant, in one instance, confined Victim with the intent to inflict death, physical injury, or a sexual offense against Victim. *See* § 30-4-1(A)(4). The evidence presented in this case—specifically, Victim's testimony—established that throughout this time frame, Defendant confined Victim by using physical force and intimidation against her, which could have reasonably formed the basis of the jury's conviction. Specifically, Victim testified that there were multiple instances in which Defendant would physically abuse her and then get tired and fall asleep, but that she had to stay by his side in an attempt to avoid another beating. *See State v. Dombos*, 2008-NMCA-035, ¶ 12, 143 N.M. 668, 180 P.3d 675

17

(explaining that "a kidnapping begins when the victim is initially confined and ends when the victim is released"). While there may have been breaks in Defendant's physical beating and interrogation of Victim, the cumulative effect of these instances intimidated Victim such that she could not leave for fear of further harm. In short, these cumulative instances provide sufficient support for Defendant's conviction, and any intervening breaks in confinement do not defeat Defendant's conviction. *See id.* ¶ 13 (holding that there was sufficient evidence to support two kidnapping convictions and one false imprisonment conviction where the incidents of kidnapping and false imprisonment "were separated by days[,] intervening events that included consensual sex, drinking, and daily activities[,] and terminations of the intent to restrain").

**II.     The Conduct Underlying Defendant's Kidnapping Conviction Was Not Merely Incidental to the Conduct That Formed the Basis of Defendant's Aggravated Battery and Aggravated Assault Convictions**

{23}     We turn next to Defendant's double jeopardy argument, in which he relies on *State v. Trujillo*, 2012-NMCA-112, 289 P.3d 238, to argue that his kidnapping conviction violates double jeopardy because it was merely incidental to the commission of the July 9 aggravated battery and aggravated assault crimes. As a basis for his issue, we understand Defendant to argue that beyond the specific July 9 acts that formed the basis of his aggravated battery and assault convictions, which were premised on the specific conduct of Defendant burning Victim with an iron and

18

putting a pistol in Victim's mouth, Victim's continued presence in Hobbs was voluntary. Stated another way, we understand Defendant to argue that the only restraint he used was that used in conjunction with the July 9 aggravated battery and assault and that there was no evidence that he intended to confine Victim beyond the completion of these acts. Defendant fails to acknowledge, however, that his use of physical force and intimidation to effectuate the confinement of Victim extended above and beyond the completion of his July 9 aggravated battery and assault crimes. Accordingly, for the reasons discussed in this Opinion, we disagree.

**{24}** In *Trujillo*, this Court held that movement or restraint that is incidental to the commission of a different crime may not also be punished as kidnapping. *Id.* ¶¶ 6-8. Whether the restraint is incidental presents a fact question that is to be evaluated based on the totality of the circumstances. *Id.* ¶¶ 42-43. *Trujillo* discusses three factors that are relevant to this analysis: (1) "whether a defendant intended to prevent the victim's liberation for a longer period of time or to a greater degree than that which is necessary to commit the other crime"; (2) "whether the detention or movement substantially increased the risk of harm over and above that necessarily present in the accompanying felony"; and (3) whether "the restraint or movement . . . [is] of the kind inherent in the nature of the other crime . . . [or has] some significance independent of the other crime in that it makes the other crime substantially easier of commission

or substantially lessens the risk of detection." *Id.* ¶¶ 32, 34, 37 (alteration, internal quotation marks, and citations omitted). The overarching question is "whether the restraint or movement increases the culpability of the defendant over and above his culpability for the other crime." *Id.* ¶ 38.

{25}     The jury instructions provided that the kidnapping occurred between July 8 and 18. As we discussed previously, Victim testified about multiple instances of confinement by force and intimidation during this time period, above and beyond the July 9 incidents where Defendant burned Victim's hand with an iron and held a pistol in her mouth. Specifically, Defendant beat Victim for "hours" at a time and passed out when he became tired. Even when Defendant was passed out, Victim had to remain next to him because if she did not, she was afraid Defendant would think she was trying to leave and the abuse would start again. Victim further testified that Defendant pushed her into a wall in the bedroom of the home, making a hole in the wall, and then choked her with a baton. Defendant also choked Victim with his hands on several other occasions and caused Victim to almost pass out every time. On a different day, toward the end of Victim's time in Hobbs, Defendant used a curtain rod that he folded in half to beat Victim on her leg from the waist down while she was on the floor of the bedroom, causing long-lasting bruising. Defendant also used a gas torch to threaten

20

Victim by placing it close to Victim's body to scare her, putting it closer to Victim's skin if she moved away, and even burning her forearm.

{26} These multiple instances of physical force and intimidation to effectuate Victim's confinement until she was able to contact the police in Albuquerque increase Defendant's culpability over and above his culpability for the July 9 crimes and provide adequate support for Defendant's kidnapping conviction. As we explained earlier, Defendant intended to prevent Victim's liberation for a longer period of time and to a greater degree than that which was necessary to burn Victim's hand with an iron and hold a pistol in her mouth. This extended confinement also significantly increased the risk of harm to Victim beyond that resulting from burning her hand with the iron and holding a pistol in her mouth. Because Defendant's cumulative use of physical force and intimidation continued for days beyond the completion of the aggravated battery and assault, lasting hours at a time and spanning the course of multiple days, we conclude that Defendant intended to and did confine Victim above and beyond the acts that formed the basis for the July 9 aggravated battery and assault convictions. *See State v. Herrera*, 2015-NMCA-116, ¶ 10, 362 P.3d 167 (holding that a period of restraint of one and a half to two hours "[was] simply not incidental to or inherent in aggravated assault under any of the tests described in *Trujillo*"), *cert. denied*, 2015-NMCERT-010, ___ P.3d ___. In short, Defendant's argument that the

21

jury's kidnapping conviction must have been premised on the aggravated battery and assault does not present a reasonable view of the evidence. *See, e.g.*, *Jacobs*, 2000-NMSC-026, ¶ 26 (holding that a defendant's claim that the restraint underlying his kidnapping conviction was the same as that used to commit attempted criminal sexual penetration and murder "[did] not present a reasonable view of the evidence" because there were multiple points at which the jury might have found that the kidnapping occurred). We conclude there was no double jeopardy violation and therefore affirm Defendant's kidnapping conviction.

**CONCLUSION**

{27}     For the foregoing reasons, we hold that there was sufficient evidence to support Defendant's kidnapping conviction and that his kidnapping conviction does not violate double jeopardy. We thus affirm.

{28}     **IT IS SO ORDERED.**

_____

**JONATHAN B. SUTIN, Judge**

**WE CONCUR:**

_____

**RODERICK T. KENNEDY, Judge**

_____

**M. MONICA ZAMORA, Judge**