903 P.2d 828

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Jerry Alvin KERSEY, Defendant–
Appellant.**

**No. 21051.**

Supreme Court of New Mexico.

Aug. 14, 1995.

Rehearing Denied Sept. 22, 1995.

or deception, with intent that the victim: ... be held for ransom ... or ... be held to service against the victim's will"); conspiracy to commit first-degree murder and/or kidnapping under NMSA 1978, Sections 30–28–2(A) (Repl.Pamp.1984) ("knowingly combining with another for the purpose of committing a [kidnapping and/or murder]"); and tampering with evidence under NMSA 1978, Section 30–22–5 (Repl.Pamp.1984) ("destroying, changing, hiding, placing or fabricating any physical evidence with intent to prevent the apprehension, prosecution or conviction of any person or to throw suspicion of the commission of a crime upon another"). The crimes for which Kersey was convicted stemmed from the kidnapping and murder of Robert Steven Farley on September 27, 1991. Kersey was sentenced to life imprisonment plus eighteen years for his offenses. On appeal, we address two issues: (1) Whether Kersey's kidnapping conviction was supported by substantial evidence establishing guilt beyond a reasonable doubt and (2) whether Kersey's convictions of felony murder and kidnapping should merge under the double jeopardy clauses of the state and federal constitutions. We review this case pursuant to SCRA 1986, 12–102(A)(2) (Repl. Pamp.1992), and affirm.

Sammy J. Quintana, Chief Public Defender, Susan Gibbs, Assistant Appellate Defender, Santa Fe, for Appellant.

Tom Udall, Attorney General, Ann M. Harvey, Assistant Attorney General, Santa Fe, for Appellee.

## OPINION

BACA, Chief Justice.

1. Defendant–Appellant, Jerry Kersey, appeals from his convictions of first-degree murder under NMSA 1978, Section 30–2–1(A)(1) or (2) (Repl.Pamp.1984) ("willful, deliberate, and premeditated killing" or "in the commission or an attempt to commit a felony"); kidnapping under NMSA 1978, Section 30–4–1 (Repl.Pamp.1984) ("unlawful taking, restraining or confining of a person, by force

## I

■ 2. The following facts were adduced at trial and are viewed on appeal in the light most favorable to sustaining Kersey's convictions, with all conflicts resolved and permissible inferences indulged in favor of upholding the verdict. *See State v. Sutphin,* 107 N.M. 126, 131, 753 P.2d 1314, 1319 (1988). In 1991, Tracy Jarvis, a high school student in Roswell, New Mexico, met Michael Clark. At the time, Jarvis was engaged to Steven Farley, who was also a high school student in Roswell. Farley's family had moved to Los Alamos and Farley was living with the Coleman family until he finished high school. Shortly after Jarvis met Clark, Clark began to attend her church and to telephone her frequently in an attempt to pursue a romantic relationship with her. Jarvis was friendly to Clark, but made it clear to him that she was engaged to Farley. By June, however,

Clark's obsessiveness with Jarvis made her uncomfortable and she ended her friendship with him. After Jarvis asked Clark to stay away from her, Clark began to harass Jarvis and Farley. He broke a window in Jarvis's car and made crank telephone calls to the Jarvis home as well as to the Coleman home. Clark also sent a letter to Jarvis's father and to Ms. Coleman on letterhead purporting to be from the Drug Enforcement Agency ("the DEA"), alleging that the DEA was investigating Farley for drug-related activity.

3. On September 26, 1991, Clark picked up his half-brother, Kersey, in Albuquerque and they drove to Roswell in Clark's light blue station wagon. Clark dropped off Kersey at a motel and later purchased an ice pick, pliers, and a package containing two steak knives from a convenience store. Around 2:00 a.m., Clark returned to the motel to pick up Kersey and they went to eat. Later that morning, Kersey purchased a pair of handcuffs and a security guard badge. Shortly after 10:00 a.m., Kersey went to the Roswell High School administrative office, claiming he was a police detective, and asked to speak with Farley. School officials told him that Farley was in a school assembly and could not be located, and asked him to come back later in the morning. At about 10:30 a.m., Kersey returned to the school, again indicating that he was a police officer. He was not wearing a uniform and did not offer any identification. When Farley arrived at the office, Kersey stated that he wanted to question Farley regarding a fight that had occurred the previous night at the mall. The assistant principal telephoned Ms. Coleman and Kersey told her to meet them at the police station in twenty to thirty minutes because he had to pick up someone else. Kersey walked out with Farley, frisked him, handcuffed him, and put him in the back seat of Clark's station wagon.

4. When Ms. Coleman arrived at the Roswell police station, she asked to speak with Detective John Fuller, the name Kersey had given her. The department had no employee by that name and initiated an investigation into Farley's disappearance. Clark became the main suspect after Ms. Coleman related to the police that he had been making crank calls to their home and harassing Farley and Jarvis. The police obtained a description of the car and of Kersey by interviewing school employees. Jarvis, who had met Kersey on two prior occasions, identified the composite drawing as Kersey.

5. Kersey and Clark pulled into a gas station later that day in Artesia, presumably with Farley in the back seat. The gas station attendant testified that he was told not to clean the windshield and to stay away from the car. A witness testified that he passed the abandoned Cedar Lake Lounge, 30 miles east of Artesia, at about 12:40 p.m. and saw a light blue station wagon parked behind it. At 2:22 that afternoon, Ms. Kendrick, Farley's mother, received a telephone call demanding a ransom of $50,000 for her son.

6. At 4:30 that afternoon, Clark contacted the police department and agreed to turn himself in. He drove to the police station in the station wagon, which was identified as the car Kersey had been driving when he went to the high school. Police searched the vehicle and found Farley's palm print on the roof and his shoe print against the window. They also found and seized pliers and a police scanner. After being interrogated for close to ten hours, Clark agreed to show the police where Farley's body was. Clark took the police to the Cedar Lake Lounge, where they found Farley's body in a small room. Farley had been strangled with an electrical cord and stabbed eleven times with an ice pick. Both the strangulation and the stabbing occurred while Farley was still alive, and either could have caused his death.

7. At 3:00 the next morning, two Roswell police officers went to Hobbs to talk to Kersey, who had turned himself in to the local police. The police took Kersey to Roswell, where he gave a second statement. He told police that while eating breakfast the previous morning, Clark told him that Farley had raped one of Clark's friends and asked Kersey if he would help beat up Farley. He admitted that he bought handcuffs and a badge and that he posed as a policeman at the high school in order to get Farley into the car. He stated that after taking Farley from the school, he picked up Clark and

Clark drove to the Cedar Lake Lounge. He further stated that he never thought Clark intended to kill Farley and thought that Clark was only going to beat up Farley and then let him go.

8. Kersey told police that once they arrived at the Cedar Lake Lounge, Farley and Clark went inside and he stayed outside. After hearing Farley scream, however, he ran inside and told Clark to stop the fight. According to Kersey, Clark stabbed Farley several times with the ice pick and then asked Kersey to hand him a piece of electrical cord. Kersey said he thought Clark was going to use it to tie up Farley and not to strangle him. Kersey watched Clark tie the cord around Farley's neck and then walked out of the building. After Clark came outside, Kersey drove them to Hobbs where Kersey phoned Farley's mother demanding the $50,000. Kersey stated that Clark suggested they make the call and that Clark supplied the phone number. He also said that they never intended to try and collect any ransom; rather, they were only trying to divert suspicion.

9. Clark entered a guilty plea in his case and Kersey proceeded to trial, where he was convicted of the above-described crimes. Kersey appeals from these convictions.

## II

10. We first address whether Kersey's kidnapping conviction was supported by evidence that could establish each element of the crime beyond a reasonable doubt. The jury was instructed to consider kidnapping in the alternative: that Farley was held for service or that Farley was taken for ransom. Kersey contends that the State failed to prove that Farley was "held for service against his will" and, in the alternative, failed to prove that Farley was taken with the intent to hold him for ransom.

■ 11. We test sufficiency of the evidence in a criminal case under the standard set by the United States Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Applying *Jackson*, we recently stated that it is "an appellate court's duty on review of a criminal conviction to determine whether *any* rational jury could have found each element of the crime to be established beyond a reasonable doubt." *State v. Garcia*, 114 N.M. 269, 274, 837 P.2d 862, 867 (1992). The application of this standard, however, "does not involve substituting the appellate court's judgment for that of the jury in deciding the reasonable-doubt question." *Id.* The court must still view the evidence in the light most favorable to the State, resolving all conflicts and indulging all permissible inferences in favor of a verdict of conviction, but must "ensure that, indeed, a rational jury *could* have found beyond a reasonable doubt the essential facts required for a conviction." *Id.* This standard does not require that we consider the "merit of evidence that may have supported a verdict to the contrary." *State v. Vigil*, 110 N.M. 254, 256, 794 P.2d 728, 730 (1990). With this standard of review in mind, we discuss each of Kersey's contentions in turn.

### A

■ 12. Kersey first argues that the State failed to establish that Farley was "held to service against his will." In *State v. Vernon*, we defined the "hold to service" element of kidnapping as requiring "that the victim be held against his or her will to perform some act, or to forego performance of some act, for the benefit of someone or something." 116 N.M. 737, 740–41, 867 P.2d 407, 410–11 (1993) (holding that the simple moving of a murder victim will not satisfy the "hold to service" element).

■ 13. Applying the above standard of review to the definition of "hold to service against the victim's will," we hold that there was sufficient evidence that Clark and Kersey held Farley for service against his will. Kersey took Farley from the high school through deception and force. He testified that he took Farley because he believed that Farley had raped and beaten a friend of Clark's and so that Clark could "slap him around a little bit" and "teach him a lesson." There was also evidence that Clark wanted to kidnap Farley to convince him to end his relationship with Jarvis. The jury could have determined that the object of the kidnapping was to convince Farley not to com-

pete romantically for Jarvis's affections, thereby conferring a benefit upon Clark. Thus, the jury could have concluded that kidnapping Farley served to benefit Clark.

■ 14. Kersey contends that restraining Farley against his will in order to convince him to end his relationship with Jarvis does not constitute "holding for service against the victim's will" under *Vernon*. We cannot agree. In *Vernon*, this Court held that discussing problems could not support a kidnapping conviction under the "hold to service" theory because "[w]hile [Defendant] may have perceived it beneficial to discuss or resolve problems, that is a rather benign service to support the penalty assessed for kidnapping." *Id.* at 741, 867 P.2d at 411. This Court also concluded that restraint and incidental movement to murder the victim did not constitute holding for service under New Mexico's kidnapping statute because "whatever benefit [Defendant] saw in taking [the victim] to a remote location, the movement was merely incidental to the murder" and "the victim [did] not confer any independent assistance or benefit to the perpetrator of the crime." *Id.* This case, however, is factually closer to *State v. Ortega*, 112 N.M. 554, 817 P.2d 1196 (1991). In *Ortega*, this Court held that inducing the victims by deception to drive Defendant to a remote spot where they could be robbed and killed constituted holding for service under the kidnapping statute. *Id.* at 571, 817 P.2d at 1213. We hold, in this case, that taking Farley by force and deception in order to convince Farley to end his relationship with Jarvis constituted "holding for service" within New Mexico's kidnapping statute.

**B**

■ 15. Kersey also contends that the State failed to present sufficient evidence to

support a finding that Farley was taken with the intent to hold him for ransom. Again, using the above standard of review, we find that substantial evidence was presented at trial to support this alternative theory of kidnapping. Kersey admitted to calling Farley's mother, Ms. Kendrick, and demanding a $50,000 ransom on the day of the kidnapping. Evidence presented at trial also established that Kersey was having financial difficulty at the time of the kidnapping. Although Kersey testified that the purpose of the ransom call was merely to divert suspicion, the jury could choose not to believe this testimony, and instead make reasonable inferences from the above evidence that Kersey kidnapped Farley with the intention of obtaining a ransom. Because a rational jury could have found Kersey guilty of kidnapping on either theory presented by the State (holding for service or ransom), we affirm Kersey's conviction of kidnapping.

**III**

■ 16. We next address whether Kersey's convictions of felony murder[1] and kidnapping should merge[2] under the double jeopardy clauses of the state and federal constitutions. The Fifth Amendment is enforceable against the states through the Fourteenth Amendment. *Benton v. Maryland*, 395 U.S. 784, 794, 89 S.Ct. 2056, 2062, 23 L.Ed.2d 707 (1969). The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution provides three separate constitutional protections. "It protects against a second prosecution for the same offense after acquittal, against a second prosecution for the same offense after conviction, and against multiple punishments for the same offense." *Justices of Boston Mun.*

---

1. Defendant frames the issue as whether his convictions for felony murder and kidnapping should merge. Because the jury returned a general verdict of first degree murder under the alternative theories of willful and premeditated murder and felony murder, we note that Defendant does not argue that willful and premeditated killing and kidnapping should merge to avoid double jeopardy.

2. We use "merge" cautiously because New Mexico has never recognized the common law doc-

trine of merger. We have discussed merger only in the context of constitutional double jeopardy. Under common law, merger occurs when two or more underlying offenses are sufficiently the same. The defendant may be convicted on all offenses but the court may sentence on only the most severe offense. Different jurisdictions interpret common law merger somewhat differently. *See Swafford v. State*, 112 N.M. 3, 12–13, 810 P.2d 1223, 1232–33 (1991).

*Court v. Lydon,* 466 U.S. 294, 306–07, 104 S.Ct. 1805, 1812, 80 L.Ed.2d 311 (1984). The New Mexico Constitution provides the same protection as the Fifth Amendment in Article II, Section 15, which states that "[n]o person . . . shall . . . be twice put in jeopardy for the same offense." This provision prevents defendants from being punished twice for the same offense. *State v. McAfee,* 78 N.M. 108, 110, 428 P.2d 647, 649 (1967). The issue before us is whether the conviction and sentencing for kidnapping and the subsequent use of that felony to elevate second-degree murder to first-degree murder constitutes multiple punishment in violation of the double jeopardy clauses of either the New Mexico Constitution or the Fifth Amendment. We find it does not.

17. The seminal case analyzing whether multiple punishments for the same act violates the double jeopardy clause is *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). In *Blockburger,* the United States Supreme Court held that consecutive sentences under two different sections of the federal narcotics laws were permissible even though there was only one sale of narcotics since "[e]ach of the offenses created requires proof of a different element." *Id.* at 304, 52 S.Ct. at 182. The *Blockburger* Court determined that "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Id.*

18. The assumption underlying the application of the test is that the legislature "ordinarily does not intend to punish the same offense under two different statutes. Accordingly, where two statutory provisions proscribe the 'same offense,' they are construed not to authorize cumulative punishments in the absence of a clear indication of contrary legislative intent." *Whalen v. United States,* 445 U.S. 684, 691–92, 100 S.Ct. 1432, 1438, 63 L.Ed.2d 715 (1980).

19. We have set forth a test for determining legislative intent in *Swafford v. State,* 112 N.M. 3, 810 P.2d 1223 (1991). The first part of the test determines "whether the conduct underlying the offenses is unitary, *i.e.,* whether the same conduct violates both statutes. The second part focuses on the statutes at issue to determine whether the legislature intended to create separately punishable offenses." *Id.* at 13, 810 P.2d at 1233. If we find the conduct is not unitary, then we need not proceed to the second prong because the Double Jeopardy Clause does not prohibit multiple punishment for "discrete acts violative of the same statute." *Id.* at 14, 810 P.2d at 1234.

20. In determining whether the conduct is unitary, we look at the conduct itself. "[I]f the defendant commits two discrete acts violative of the same statutory offense, but separated by sufficient indicia of distinctness, then a court may impose separate, consecutive punishments for each offense." *Id.* at 13, 810 P.2d at 1233. Indicia of distinctness may be found where "events are sufficiently separated by either time or space (in the sense of physical distance between the places where the acts occurred)." *Id.* at 13–14, 810 P.2d at 1233–34. Upon finding sufficient separation of events, "then it is a fairly simple task to distinguish the acts." *Id.*

21. The Court found distinct conduct in *State v. McGuire,* 110 N.M. 304, 795 P.2d 996 (1990), when the defendant abducted his victim while stealing her car, raped her, and then some time later, forced her into the woods where he murdered her. Defendant argued that the same acts were used to establish both kidnapping and criminal sexual penetration ("CSP") and then used a third time to raise CSP to a second-degree felony. *McGuire* concluded that the jury could find "independent factual bases for its guilty verdict on each of these counts" and therefore the conduct was not unitary. *Id.* at 309–10, 795 P.2d at 1001–02. The Court found that "[o]nce defendant restrained the victim with the requisite intent to hold her for service against her will, he had committed the crime of kidnapping, although the kidnapping continued throughout the course of defendant's other crimes and until the time of the victim's death." *Id.* at 309, 795 P.2d at 1001.

22. The Court also found distinct conduct in *Swafford*, where the defendant bound his half sister to her bed before raping her. From this single criminal episode, the defendant was convicted on third degree CSP, incest, assault with intent to commit violent felony, and false imprisonment. *Swafford*, 112 N.M. at 16, 810 P.2d at 1236. We noted that the conduct of assault with the intent to commit a felony and CSP was not unitary, even though the assault conviction required commission of a violent felony. *Id.* at 16 & n. 9, 810 P.2d at 1236 & n. 9. Our decision was based on the fact that the defendant bound his victim, struck her several times, and threatened her over a period of time before he actually sexually assaulted her. Therefore, the assaultive episode was sufficiently distinct from the sexual assault. *Id.* at 16, 810 P.2d at 1236. Because the conduct was not unitary, there was no double jeopardy violation. *Id.; see also Ortega*, 112 N.M. at 571, 817 P.2d at 1213 (where victims held for service, conduct for kidnapping and murder was separate and distinct and not unitary).

23. A defendant may be charged with kidnapping and murder as a result of distinct or unitary conduct. When a victim is incidentally moved during the course of a murder, the "hold to service" requirement of kidnapping is not met, the conduct is unitary and the legislative intent to punish for felony murder is absent. *Vernon*, 116 N.M. at 741, 867 P.2d at 411. It is only where the crime of kidnapping is distinct and separate that the legislature permits separate punishment. *See McGuire*, 110 N.M. at 308–09, 795 P.2d at 1000–01; *Pierce*, 109 N.M. at 601, 788 P.2d at 357. While felony murder requires that another felony has occurred, "if the conduct is separate and distinct, inquiry is at an end." *Swafford*, 112 N.M. at 14, 810 P.2d at 1234.

24. In the present case, Defendant kidnapped Farley at the high school in Roswell about 10:30 a.m. Although kidnapping is a continuing offense, the conduct required to establish kidnapping was completed at the time Defendant, with the intent to hold Farley for service, unlawfully and forcibly took him from the school. This conduct alone did not violate the felony murder statute. The felony-murder statute was violated more than two hours later, nearly sixty miles distant from the abduction, when Farley was strangled and stabbed to death. The kidnapping was sufficiently separated in time and space from the murder to establish two distinct crimes. Consequently, we hold that Kersey's sentences for both kidnapping and felony murder do not violate the double jeopardy clauses of either the New Mexico or the United States Constitutions.

25. We conclude that there was sufficient evidence to support the conviction for kidnapping. When the evidence also indicates that the kidnapping was sufficiently distinct from the murder to satisfy the "holding for service" requirement, punishment for both crimes does not violate the double jeopardy clauses of the New Mexico or Federal Constitutions.

26. The order of the trial court is **AFFIRMED.**

27. **IT IS SO ORDERED.**

RANSOM, FRANCHINI, FROST and MINZNER, JJ., concur.