The slip opinion is the first version of an opinion released by the Chief Clerk of the Supreme Court. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Chief Clerk for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

**IN THE SUPREME COURT OF THE STATE OF NEW MEXICO**

Opinion Number:

Filing Date: February 16, 2026

**NO. S-1-SC-40141**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.

**MARK R. VALENCIA,**

Defendant-Appellant.


**APPEAL FROM THE DISTRICT COURT OF SAN MIGUEL COUNTY**
**Abigail P. Aragon, District Judge**


Bennett J. Baur, Chief Public Defender
Kimberly Chavez Cook, Appellate Defender
Joelle N. Gonzales, Assistant Appellate Defender
Santa Fe, NM

for Appellant

Raúl Torrez, Attorney General
Van Snow, Acting Deputy Solicitor General
Albuquerque, NM

for Appellee

**OPINION**

**BACON, Justice.**

{1}     Defendant has filed a motion for rehearing. We grant the motion for rehearing. We withdraw the opinion filed July 14, 2025, and substitute the following in its place.

{2}     This is a capital appeal pursuant to Rule 12-102(A)(1) NMRA wherein Mark R. Valencia (Defendant) raises four challenges. First, Defendant argues his convictions on two counts of first-degree murder (willful and deliberate), contrary to NMSA 1978, Section 30-2-1(A)(1) (1994), and one count of second-degree attempt to commit first-degree murder (willful and deliberate), contrary to NMSA 1978, Section 30-28-1(A) (1963, amended 2024) and Section 30-2-1(A)(1), must be reversed because the district court denied his request for the jury to be instructed on diminished capacity to form requisite intent due to voluntary intoxication. Second, Defendant argues his convictions for fourth-degree aggravated assault with a deadly weapon, contrary to NMSA 1978, Section 30-3-2(A) (1963), and attempt to commit first-degree murder, contrary to Section 30-28-1(A) (1963), violated double jeopardy. Third, Defendant argues his convictions for fourth-degree shooting at a dwelling or occupied building, contrary to NMSA 1978, Section 30-3-8(A) (1993), and misdemeanor negligent use of a deadly weapon, contrary to NMSA 1978,

Section 30-7-4(A)(2) (1993), violated double jeopardy. Fourth, Defendant argues the district court lacked statutory authority to increase his basic sentence for attempt to commit first-degree murder with a three-year firearm enhancement.

{3}     Defendant's convictions on both charges of first-degree murder and on the charge of attempted first-degree murder are reversed and remanded for a new trial because Defendant was improperly denied his request for voluntary-intoxication jury instructions. As a consequence of the reversal, we do not address Defendant's additional claims relating to the charge of attempted first-degree murder: his double-jeopardy claim involving aggravated assault and his claim regarding the firearm enhancement. Defendant's convictions for shooting at a dwelling or occupied building and negligently using a deadly weapon are affirmed.

## I.     BACKGROUND

### A.     Facts

{4}     During the evening of December 11, 2021, Defendant and his girlfriend, murder-victim Eva Aragon (Aragon), went to socialize with Aragon's uncle, David Sturgeon (Sturgeon), at Sturgeon's house in Pecos, New Mexico. Sturgeon and his friend, murder-victim Steven Singer (Singer), were at the house drinking beers before Defendant and Aragon arrived. Defendant and Aragon had also been drinking prior to meeting up with Sturgeon and Singer.

{5} Once at the house, Defendant, Aragon, and Singer took shots of vodka, and progressed to simply passing around the bottle. They finished one bottle and started sharing a second. Around seven or eight o'clock, Singer gave Defendant a haircut, which started an argument because Defendant was not happy with the result. Singer and Defendant argued and pushed each other, and Defendant then retrieved a gun from his vehicle. While Defendant was retrieving the gun, Sturgeon closed and locked the front door of the house. Defendant shot at the front door at least eight times, eventually shot the lock, and opened the door.

{6} Singer and Aragon were standing just inside the door. Defendant shot Singer in the head just below the left nostril, killing him. Aragon got down on the floor next to Singer, and Defendant then shot Aragon between the eyes, killing her as well.

{7} Defendant pointed the gun at Sturgeon and said he would shoot him, too. Sturgeon hid in a closet and called 911. Defendant walked around the house, and repeatedly said he was going to find and shoot Sturgeon. Defendant "shot the whole house up," with one bullet going into the closet where Sturgeon was hiding.

{8} Police were dispatched around 9:26 p.m. and arrived at the scene within fifteen minutes. The scene was quiet when they arrived. They checked each vehicle in front of the house for people, finding Defendant slumped over the steering wheel in the driver's seat of Sturgeon's van. Defendant was not moving, so the police did

not know whether he was deceased or asleep. He had an unlit cigar or cigarette in his hand, smelled of alcohol, and was not wearing shoes. Police woke Defendant, but it took a while to get his attention. Defendant was put in a patrol car without incident. While in the patrol car, he repeatedly hung his head and mumbled incoherently to himself.

{9} At approximately 2:00 a.m., agents questioned Defendant about what happened. The agents noticed Defendant had slow speech, as well as bloodshot and watery eyes. Defendant confessed to the shootings. He claimed he shot Singer because Singer started "coming at him" and he shot Aragon because she got in the way. Defendant denied threatening Sturgeon and also said he did not remember firing any shots after shooting Singer. Also, he told the agents he had a lot to drink—half a fifth of vodka and two beers. Defendant was subsequently charged with, inter alia, the murders of both Singer and Aragon. Additional facts are provided in the analysis sections herein as relevant.

**B. Procedural History**

{10} In August 2023, Defendant was tried by a jury on two counts of first-degree murder (willful and deliberate), attempt to commit first-degree murder (willful and deliberate), aggravated assault with a deadly weapon, shooting at a dwelling or occupied building, and negligent use of a deadly weapon. Defendant's theory of the

case on both counts of first-degree murder and on attempt to commit first-degree murder was that he was too intoxicated to form the requisite mental state—deliberate intention—required to commit the offenses. He requested a voluntary intoxication jury instruction pursuant to UJI 14-5110 NMRA for both charges of first-degree murder, and a like instruction pursuant to UJI 14-5111 NMRA for the charge of attempt to commit first-degree murder. The district court denied his request, reasoning the instructions were not supported by the evidence. Defendant was found guilty on all charges. The jury also found he "used" a firearm in the commission of the first-degree murder of Aragon, the attempted first-degree murder of Sturgeon, and the aggravated assault against Sturgeon, as well as while shooting at a dwelling or occupied building.

{11} The district court imposed a sentence of life without possibility of parole, NMSA 1978, § 31-18-14 (2009), for each of the first-degree murder convictions: a nine-year basic sentence, NMSA 1978, § 31-18-15(A)(7) (2019, amended 2025), for the conviction of second-degree attempt to commit first-degree murder; and an eighteen-month sentence, § 31-18-15(A)(13) (2019), for the conviction of fourth-degree shooting at a dwelling or occupied building. The district court ran all of those sentences consecutively. Pursuant to NMSA 1978, Section 31-18-16(A) (2020, amended 2022), the district court enhanced Defendant's conviction of attempt to

commit first-degree murder with a three-year firearm enhancement, also run consecutively; the district court did not enhance any of Defendant's other convictions.[1] Finally, the district court sentenced Defendant to serve eighteen months for conviction of fourth-degree aggravated assault with a deadly weapon, pursuant to § 31-18-15(A)(13) (2019), and 365 days for misdemeanor negligent use of a deadly weapon, pursuant to NMSA 1978, § 31-19-1(A) (1984). These two sentences were to be served concurrently with other sentences.

{12}   Defendant timely appealed his convictions directly to this Court pursuant to Rule 12-102(A)(1), and raises the following issues:

(1)   whether the district court erred by failing to instruct the jury on diminished capacity due to voluntary intoxication as it pertained to the charges of first-degree murder (willful and deliberate) and attempt to commit first-degree murder (willful and deliberate);

(2)   whether his convictions of attempted murder and aggravated assault violated double jeopardy;

---

[1]The firearm enhancement in Section 31-18-16 only applies to noncapital felonies. Therefore, it was inconsequential for the jury to pass on whether Defendant used a firearm in the commission of first-degree murder.

(3)     whether his convictions of shooting at a dwelling or occupied building and negligent use of a deadly weapon violated double jeopardy; and

(4)     whether the firearm enhancement was unlawful because "using" a firearm in the commission of a noncapital felony was not, on the date of the offense, enhanceable conduct under Section 31-18-16 (2020).

## II.     DISCUSSION

{13}     We begin by addressing whether the district court's denial of Defendant's request for jury instruction on diminished capacity constituted reversible error (Issue 1). Concluding denial was improper, we consequently reverse Defendant's convictions on two counts of first-degree murder and one count of attempt to commit first-degree murder and remand for a new trial as to those charges. Because we reverse the attempt conviction, we need not reach Defendant's first double jeopardy challenge (Issue 2) that involved the attempt conviction. We do, however, address Defendant's second double jeopardy challenge (Issue 3), concluding there was no such violation and thus affirming. Finally, we need not reach Defendant's argument that the sentence for the firearm enhancement was unlawful (Issue 4) because the enhancement was only imposed on his attempt conviction, which we reverse.

**A.   Voluntary Intoxication Jury Instructions**

**1.   Standard of review**

{14}   There are two standards we employ to determine the outcome of this issue. The first is the standard of appellate review: "The propriety of denying a jury instruction is a mixed question of law and fact that we review de novo." *State v. Swick*, 2012-NMSC-018, ¶ 60, 279 P.3d 747 (internal quotation marks and citation omitted). Second, because there is no dispute about whether the issue was preserved, as Defendant timely requested the instructions, argued for them during trial, and cited proper authority, we review for reversible error. *State v. Benally*, 2001-NMSC-033, ¶ 12, 131 N.M. 258, 34 P.3d 1134.

**2.   Analysis**

{15}   For the charges of first-degree murder, the jury had to find Defendant acted with a specific "deliberate intention" to take away the lives of Singer and Aragon; for attempt to commit first-degree murder, the jury had to find Defendant acted with the specific intent to commit the crime of first-degree murder, which in turn required Defendant to have a deliberate intention to take away the life of Sturgeon. The jury was given the following instruction pursuant to UJI 14-201 NMRA for both charges of first-degree murder and for the charge of attempt to commit first-degree murder:

A deliberate intention refers to the state of mind of the defendant. A deliberate intention may be inferred from all of the facts and

circumstances of the killing. The word deliberate means arrived at or determined upon as a result of careful thought and the weighing of the consideration for and against the proposed course of action. A calculated judgment and decision may be arrived at in a short period of time. A mere unconsidered and rash impulse, even though it includes an intent to kill, is not a deliberate intention to kill. To constitute a deliberate killing, the slayer must weigh and consider the question of killing and his reasons for and against such a choice.

{16} Defendant's sole defense at trial was that his intoxication impaired his ability to form the deliberate intent required to be convicted of either first-degree murder or attempt to commit first-degree murder. "The defense of inability to form specific intent allows a defendant to avoid culpability for willful and deliberate murder whenever he or she was unable to form the specific intent required to commit the crime." *State v. Boyett*, 2008-NMSC-030, ¶ 27, 144 N.M. 184, 185 P.3d 355; *see also State v. Brown*, 1996-NMSC-073, ¶ 22, 122 N.M. 724, 931 P.2d 69 (defining a "specific-intent crime" as a crime "for which a statute expressly requires proof of intent to do a further action or achieve a further consequence," while defining a general intent crime as one only requiring a "conscious wrongdoing" (internal quotation marks and citations omitted)). The defense of inability to form specific intent "applies in two situations: (1) when the defendant was intoxicated from the use of alcohol or drugs and (2) when the defendant suffered from a mental disease or disorder." *Boyett*, 2008-NMSC-030, ¶ 27. Only the former is at issue in this case,

for the purpose of informing the requested instructions for first-degree murder and attempt to commit first-degree murder.

{17} To be entitled to a voluntary intoxication jury instruction, "the defendant must present evidence that (1) he or she consumed intoxicants, (2) he or she was actually intoxicated, and (3) the degree of intoxication interfered with his or her ability to develop the requisite intent to commit the charged crime." *State v. Arrendondo*, 2012-NMSC-013, ¶ 43, 278 P.3d 517. "In deciding whether the instruction is proper, the trial court must not weigh the evidence, but must simply determine whether such evidence exists." *State v. Privett*, 1986-NMSC-025, ¶ 20, 104 N.M. 79, 717 P.2d 55. So long as there is "enough [of such] evidence to raise a reasonable doubt in the mind of a juror," the instruction should be given. *State v. Rudolfo*, 2008-NMSC-036, ¶ 27, 144 N.M. 305, 187 P.3d 170.[2] "When considering a defendant's requested

---

[2]We note that this Court in *Rudolfo* expressly abandoned the "'slight evidence'" standard for jury instructions pursuant to affirmative defenses, clarifying that "[f]or a defendant to be entitled to a self-defense instruction, for example, there need be only enough evidence to raise a reasonable doubt in the mind of a juror about whether the defendant lawfully acted in self-defense." 2008-NMSC-036, ¶ 27. Despite this direction, we improperly carried forward the pre-*Rudolfo* standard in *State v. Smith*, 2021-NMSC-025, ¶ 12, 491 P.3d 748 ("An instruction on the essential element of unlawfulness 'is warranted if there is any evidence, even slight evidence, supporting [a defendant's corresponding theory of the case].'" (alteration in original) (quoting *State v. Gaines*, 2001-NMSC-036, ¶ 5, 131 N.M. 347, 36 P.3d 438)). We clarify that *Smith* was in error as regards the "'slight evidence'" standard but otherwise remains good law.

instructions, we view the evidence in the light most favorable to the giving of the requested instructions." *Boyett*, 2008-NMSC-030, ¶ 12 (text only) (citation omitted).[3]

{18}    Looking at the *Arrendondo* elements, the district court found there was evidence to establish Defendant had consumed intoxicants and was actually intoxicated. However, the district court found the evidence did not support the third *Arrendondo* element regarding whether the degree of intoxication interfered with Defendant's ability to form the requisite intent. We disagree.

**a.    The district court improperly weighed the evidence and failed to consider the evidence in the light most favorable to giving the requested instructions**

{19}    Prior to arriving at its conclusion that the evidence did not support the third *Arrendondo* element, the district court articulated for the record the evidence it was considering. Before listing the evidence, the district court stated, "The court is not weighing the evidence, but the court must note the evidence." The district court then proceeded to weigh the evidence by pitting facts tending to prove the third *Arrendondo* element against facts tending to disprove the element:

---

[3]"(Text only)" indicates the omission of nonessential punctuation marks—including internal quotation marks, ellipses, and brackets—that are present in the text of the quoted source, leaving the quoted text otherwise unchanged.

The evidence before the [district] court is that there was vodka consumed. It was shared by Mr. Singer, Ms. Aragon, and by [Defendant]. There was some verbal, perhaps, altercation. At that time, [Defendant] left the home on his own power. He entered his vehicle on his own power. He located his weapon—the 9 mm weapon, and he obtained the weapon and the magazine. Although the court has no evidence before it as to whether the weapon was already loaded or not, clearly it had the magazine. He walked back to the home on his own power. He shot the door approximately, I believe, eight to fifteen times until the lock was broken on the door. He then entered the home— again, there is no evidence of stumbling—and shot Mr. Singer. He then shot Ms. Aragon. . . . Defendant then walked back to his own vehicle and placed the weapon in his own vehicle. He then entered the van belonging to Mr. Sturgeon on his own power. Upon arrest—although there is evidence that his head was slumped over, and they did not know whether he was dead or alive—he was able to crawl across the console of the van on his own power. There was no evidence that he stumbled. He was then placed in handcuffs. He walked on his own power to the patrol vehicle. The evidence also shows that he carried on a conversation with the patrol officer, almost immediate in time, including a discussion of football teams. Specifically, it shows his ability to articulate [his thoughts on] the [Dallas] Cowboys. There is also no evidence that he vomited, which . . . might indicate extreme intoxication.

Weighing evidence occurs when a court considers the degree to which evidence proves or disproves a fact. This includes any determination about the persuasiveness of the evidence when compared to the persuasiveness of other evidence. *Weight of the evidence*, *Black's Law Dictionary* (12th ed. 2024) (defining "weight of the evidence" as "[t]he persuasiveness of some evidence in comparison with other evidence"). The district court's focus on Defendant's ability to move about "on his own power," to make intelligent choices such as retrieving and then returning his

gun to his vehicle, his ability to "crawl" over the van's console, and his ability to converse with police reveals the district court was weighing the evidence by comparing evidence pro and con on the issue of whether Defendant's degree of intoxication interfered with his ability to form the requisite intent.

{20} By weighing the evidence in this manner, the district court also failed to view the evidence in the light most favorable to giving the instruction. To view evidence in the light most favorable to a certain outcome means a court must indulge all reasonable inferences *and resolve all conflicts in the evidence* in favor of the outcome. *See State v. Kersey*, 1995-NMSC-054, ¶ 11, 120 N.M. 517, 903 P.2d 828; *Light most favorable*, *Black's Law Dictionary* (12th ed. 2024) (defining "light most favorable" as "[t]he standard of scrutinizing or interpreting a verdict by accepting as true all evidence and inferences that support it and disregarding all contrary evidence and inferences"). Applied here, the district court should not have considered facts tending to prove sobriety, such as Defendant's ability to move "on his own power" and converse with police. Rather, the district court should have only considered evidence tending to prove intoxication.

**b.** **Evidence was presented showing that Defendant's degree of intoxication interfered with his ability to form a deliberate intent to kill**

{21} The trial record contained the following evidence relevant to the issue of whether the degree of Defendant's intoxication interfered with his ability to form a deliberate intent:

(1) Defendant had already been drinking before arriving at Sturgeon's house;

(2) After arriving at Sturgeon's home, Defendant drank beer and vodka;

(3) Defendant took shots of vodka;

(4) After taking shots, Defendant and two others consumed the vodka by passing around the bottle;

(5) Defendant and two others finished one bottle (a fifth, i.e., approximately 750 ml);

(6) Defendant and two others passed around a second bottle;

(7) Defendant was drunk by the time the second bottle was opened;

(8) Defendant appeared to be as intoxicated as Aragon who, when tested post-mortem, had a blood-alcohol level of .292;

(9) Defendant was found by police slumped over the steering wheel of Sturgeon's van with an unlit cigar or cigarette and no shoes;

(10) When an officer looked into the van and found Defendant, she could not tell if Defendant was deceased or asleep;

(11)   It took "some time" for Defendant to comprehend that police were waking him up after he fell asleep in the van;

(12)   While in the back of the patrol car, Defendant had his head down and was mumbling to himself;

(13)   Defendant told officers he had drunk "a lot . . .—half a fifth of vodka and probably two beers" over the course of three to four hours;

(14)   Defendant did not remember firing any other shots or remember anything after shooting Singer.

{22}   Viewing this evidence in the light most favorable to giving the instruction, and refraining from weighing this evidence against countervailing evidence of sobriety, these facts could have supported a conclusion that Defendant was intoxicated to a degree that interfered with his ability to form a deliberate intent to kill. To begin, the evidence showed the quantity of alcohol consumed was significant: at least half a bottle of vodka and two beers. This is relevant because a juror could logically reason the more alcohol Defendant consumed, the more intoxicated he would be, and a higher degree of intoxication increases the potential the intoxication interfered with Defendant's ability to deliberate. Further, testimony revealed Defendant was intoxicated to the same degree as Aragon, whose post-mortem BAC was .292. True, it would be speculation to conclude Defendant's BAC

was at a similar level because his level was not documented, but the importance of this fact is that Defendant *appeared* like someone with a .292 BAC.

{23} Next, Defendant was found inside Sturgeon's van, slumped over the steering wheel, unshod, holding an unlit cigar or cigarette. Defendant did not leave the scene, which could lead a reasonable juror to conclude his mental faculties were seriously impaired. After all, reason and experience inform us that culpable people *leave* crime scenes, not that they sleep at them. *See, e.g.*, *State v. Trujillo*, 1981-NMSC-023, ¶ 31, 95 N.M. 535, 624 P.2d 44 (holding that evidence of flight after a crime is committed is admissible to prove consciousness of guilt). Being slumped over the steering wheel could indicate to a reasonable juror that Defendant was intoxicated to the degree he was able to fall asleep in what could be seen as an extremely uncomfortable position. Additionally, because he was "slumped over the steering wheel," a reasonable mind could conclude Defendant did not purposefully put himself in that position to go to sleep, but rather passed out as a result of his intoxicated state. Passing out, or falling asleep unwillfully, could reasonably correlate with a heightened degree of intoxication and a seriously impaired mind. The unlit cigarette could further support this theory because Defendant presumably would not hold a cigarette just to go to sleep with it in his hand. Rather, a reasonable inference could be that he removed a cigarette from its pack but passed out before

he could light it. Further, the fact Defendant was not wearing shoes could be reasonably interpreted as his inability to think cogently or plan effectively because, typically, people put on shoes when they leave the house, especially if they enter a vehicle intending to drive. Finally, Defendant said that he "did not remember firing any other shots or anything after shooting [Singer]." If believed, this could mean that Defendant was intoxicated to such a degree that he could not remember anything after shooting Singer, which would mean he did not even remember shooting Aragon. A logical inference could be that at the time of the killings he was so intoxicated that he later had no memory of major aspects of the events.

{24}    In arriving at the conclusion that evidence showed the degree of intoxication interfered with Defendant's ability to form a deliberate intent, we acknowledge there was significant evidence of sobriety. For example, Defendant told officers he "thought about [going home]" but returned to the house with his gun because he did not want to leave Aragon there. Also, as the district court acknowledged, he moved about on his own power and was cogent enough to retrieve the firearm from his vehicle and converse with police. Further, there was not only evidence of sobriety but contradictory statements by Defendant that could readily cause any factfinder to discredit his theory of the case. For example, Defendant said he did not remember anything after shooting Singer, which would mean he did not remember shooting

Aragon, but also said he only shot Aragon because she "got in the way." Clearly, these two versions of the facts cannot coexist. However, all the evidence of sobriety, along with evidence cutting against Defendant's credibility, should not have been considered by the district court because evidence must not be weighed and must be viewed in the light most favorable to giving the requested instruction.

{25}   Applying these principles, sufficient evidence supported instructing the jury on diminished capacity due to voluntary intoxication.[4] We consequently reverse Defendant's convictions on both counts of first-degree murder and on attempt to commit first-degree murder and remand for a new trial on those charges. *See Brown*, 1996-NMSC-073, ¶ 34 ("When evidence at trial supports the giving of an instruction on a defendant's theory of the case, failure to so instruct is reversible error.").

---

[4]Our determination that Defendant was entitled to jury instructions pursuant to UJI 14-5110 and UJI 14-5111 should not be read as endorsing the relevant instructions submitted by Defendant to the district court, as those proposed instructions constituted deeply flawed statements of law. *See State v. Nieto*, 2000-NMSC-031, ¶ 17, 129 N.M. 688, 12 P.3d 442; *State v. Salazar*, 1997-NMSC-044, ¶ 57, 123 N.M. 778, 945 P.2d 996 ("It is not error for a trial court to refuse instructions which are inaccurate."); *State v. Casteneda*, 1982-NMCA-046, ¶ 33, 97 N.M. 670, 642 P.2d 1129 ("In order to premise error on the refusal of the trial court to instruct, the defendant must tender a legally correct statement of law.").

**B.    Double Jeopardy**

{26}    Defendant contends his convictions for shooting at a dwelling or occupied building and negligently using a deadly weapon violated double jeopardy. We conclude double jeopardy was not violated and affirm both convictions.

**1.    Standard of review**

{27}    "A double jeopardy challenge presents a question of constitutional law, which we review de novo." *State v. Torres*, 2018-NMSC-013, ¶ 17, 413 P.3d 467.

**2.    Analysis**

{28}    Under the United States and New Mexico Constitutions, no person shall be "twice put in jeopardy" for the same offense. U.S. Const. amend. V; N.M. Const. art. II, § 15. "The double jeopardy clause protects against (1) a second prosecution for the same offense after acquittal, (2) a second prosecution for the same offense after conviction, and (3) multiple punishments for the same offense." *State v. Begaye*, 2023-NMSC-015, ¶ 12, 533 P.3d 1057 (internal quotation marks and citation omitted). "[M]ultiple punishment cases [come to this Court] in two ways." *Id.* "First, there are double description cases in which a single act results in multiple charges under different criminal statutes. Second, there are unit of prosecution cases in which an individual is convicted of multiple violations of the same criminal statute." *Id.* (text only) (citation omitted). Here, both double jeopardy issues present

double-description cases because Defendant argues he was convicted multiple times under different criminal statutes for the same act.

{29} When faced with a double-description challenge, we follow the two-part test adopted in *Swafford v. State*, 1991-NMSC-043, ¶ 25, 112 N.M. 3, 810 P.2d 1223. *Begaye*, 2023-NMSC-015, ¶ 13. "First, we assess whether the conduct underlying the offenses is unitary," which is "whether the same conduct violates both statutes. Second, we examine the statutes at issue to determine whether the legislature intended to create separately punishable offenses." *Id.* (text only) (quoting *Swafford*, 1991-NMSC-043, ¶ 25). Only if the conduct is unitary and the legislature did not intend to create separately punishable offenses will the double jeopardy clause prohibit multiple punishment in the same trial. *Id.*

{30} To determine whether the conduct was unitary, we ask "whether the conduct underlying both convictions is sufficiently distinct as to time, place, or action." *Id.* ¶ 14. "The conduct question depends to a large degree on the elements of the charged offenses and the facts presented at trial." *Id.* ¶ 20 (internal quotation marks and citation omitted). To determine the elements of the charged offenses, we look to the jury instructions presented at trial. *Cf. State v. Holt*, 2016-NMSC-011, ¶ 20, 368 P.3d 409 (stating that when a reviewing court determines whether sufficient evidence supports each element of a charged offense, the "jury instructions become the law

of the case" (text only) (citation omitted)). When the legal theory is still unclear based on the elements of the charged offenses and facts presented at trial, we may also review opening statements and closing arguments "to establish whether the same evidence supported a defendant's convictions under both statutes." *Begaye*, 2023-NMSC-015, ¶ 18 (internal quotation marks and citation omitted).

{31}   Defendant argues the conduct underlying both shooting at a dwelling or occupied building and negligent use of a deadly weapon was unitary "because [he] was carrying a firearm while intoxicated when he shot at a dwelling or occupied building." The State counters that the conduct was not unitary because "carrying a gun without discharging it while drunk is different from shooting [at] a home knowing that there are people inside." We agree with the State that the conduct was not unitary. In arriving at this conclusion, we underscore *Begaye*'s direction that the conduct question depends to a large degree on the elements of the charged offenses and the facts presented at trial.

{32}   According to the jury instructions, for the charge of shooting at a dwelling or occupied building, the prosecution had to prove Defendant (1) willfully shot at a dwelling or occupied building and (2) knew the building was a dwelling or was occupied. *See* UJI 14-340 NMRA. For negligent use of a deadly weapon, the prosecution had to prove Defendant carried a firearm while under the influence of

alcohol. *See* UJI 14-703 NMRA. While the elements of each charge involve a firearm, they are otherwise distinct.

{33} Additionally, by the facts of the case, Defendant's "negligent use of a firearm" was complete the moment he grabbed the firearm out of the car, but he only completed shooting at a dwelling or occupied building after he pulled the trigger on the gun and sent the first of at least eight bullets into Sturgeon's front door. Further, Defendant's "negligent use of a firearm" continued after he shot the front door because he was carrying his gun while inside Sturgeon's house. True, while Defendant was shooting at the front door he was also negligently using a firearm because he was carrying his gun while intoxicated, but overlapping conduct does not make the conduct unitary. Only if conduct were to overlap to the point where the acts were without "sufficient indicia of distinctness" would such conduct be unitary. *Begaye*, 2023-NMSC-015, ¶ 20 (internal quotation marks and citation omitted). Here, that was not the case because instances of Defendant carrying his gun while intoxicated occurred distinctly both before and after he shot at Sturgeon's front door.

{34} Thus, based on the elements of the charged offenses and the facts presented at trial, the conduct was not unitary. Because the conduct was not unitary, double jeopardy was not violated, and we need not analyze whether the Legislature intended

multiple punishments. Defendant's convictions for shooting at a dwelling or occupied building and for negligently using a deadly weapon are affirmed.

## III.    CONCLUSION

{35}    Defendant's convictions on both counts of first-degree murder and on one count of attempted first-degree murder are reversed and remanded for a new trial. Defendant's convictions for shooting at a dwelling or occupied building and for negligently using a deadly weapon are affirmed.

{36}    **IT IS SO ORDERED.**

_____
**C. SHANNON BACON, Justice**

**WE CONCUR:**

_____
**DAVID K. THOMSON, Chief Justice**

_____
**MICHAEL E. VIGIL, Justice**

_____
**JULIE J. VARGAS, Justice**

_____
**BRIANA H. ZAMORA, Justice**